**ST. LOUIS COUNTY, Missouri, Plaintiff/Respondent,**

v.

**B.A.P., Incorporated, Defendant/Appellant.[1]**

**No. ED 75241.**

Missouri Court of Appeals,
Eastern District,
Division Four.

March 21, 2000.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 10, 2000.

Application for Transfer Denied
June 27, 2000.

1. The Circuit Court of the County of St. Louis consolidated two cases: Cause No. 97CC–1681, which was pursued by St. Louis County, Missouri, (County) against B.A.P., Incorporated, (B.A.P.) and Peter Pigman; and Cause No. 97CC–2636, which was pursued by B.A.P. and Pigman against County. The trial court resolved these two consolidated cases in one Amended Judgment, which is the judgment from which B.A.P. took this appeal. By consent, Pigman was dismissed from the cases and is not a party to this appeal. We will discuss the trial court proceedings as though Pigman had not pursued any claims.

Murry A. Marks, Johnathan D. Marks, St. Louis, for appellant.

John A. Ross, County Counselor, Michael A. Shuman, Asst. County Counselor, Clayton, for respondent.

MARY K. HOFF, Judge.

■ B.A.P., Incorporated, (B.A.P.) appeals from the trial court's Amended Judg-

ment (Judgment) entered in favor of St. Louis County, Missouri, (County) and against B.A.P. after a non-jury trial to resolve Free Speech challenges to location restrictions on adult businesses set forth in County's zoning ordinance and licensing ordinance.[2] We affirm.

Through passage of Ordinance No. 17,-621 in 1995, County amended its zoning ordinance by enacting regulations pertaining to the location of businesses selling sexual devices or other sexually explicit materials. We refer to that ordinance as the zoning ordinance. In relevant part the zoning ordinance provides as follows:

> 17. An adult business shall not be located within one thousand (1,000) feet of the property line of any church, school, library, or park, nor within three hundred (300) feet of any property zoned R Residence District or NU Non–Urban District, nor within one thousand (1000) feet of two (2) other such uses. An adult business is any business which offers its patrons goods of which a substantial portion are adult oriented items or services relating to such items. Any business where more than twenty-five (25) percent of the retail value of merchandise offered for sale consists of adult oriented items shall be presumed to be an adult business. No adult business shall advertise, display or promote adult oriented items so that they are visible from outside the premises.

Section 1003.167.17 SLCRO 1974, as amended.[3] In its definitions, the zoning ordinance states:

> (4) *Adult oriented items* shall consist of:
>
> (a) *Sexual devices:* Any three (3) dimensional object designed or marketed as useful primarily in the performance of a sexual act or to enhance or entice sexual stimulation or gratification. Such devices include any item which has no substantial non-sex related utility, such as erotic undergarments and artificial sexual organs, as well as devices with other utility when they are marketed for sexual purposes, such as chains, handcuffs, or the like, but does not include devices primarily intended for protection of health or prevention of pregnancy; or
>
> (b) *Sexually explicit materials* : Any book, magazine, pamphlet, newspaper or other printed or written matter, picture, drawing, photograph, motion picture film, pictorial representation, statue, figure, or other three (3) dimensional object, recording, transcription or anything which is or may be used as a means of communication that depicts, describes, or portrays human sexual intercourse, sodomy, bestiality, oral copulation, masturbation, urinary and defecatory functions, sadism, masochism, sado-masochistic abuse, exhibition of the genitals or any touching of the genitals, pubic areas, or buttocks of the human male or

**2.** While not expressly addressing B.A.P.'s "unclean hands" defense to County's Petition, the trial court found that B.A.P.'s estoppel defense did "not lie to prevent issuance of an injunction." With respect to certain challenges to definition and other provisions of the zoning ordinance in B.A.P.'s Counterclaim, the trial court concluded the zoning ordinance was not overbroad or vague, and did not expressly address the challenges based on the Equal Protection and Due Process clauses of the Fourteenth Amendment to the United States Constitution, or Article I, Sections 8 and 10 of the Missouri Constitution. With respect to certain federal constitutional challenges to the licensing ordinance set forth in B.A.P.'s Petition, the trial court found the sign regulations "constitutionally acceptable," the employee restrictions "val-

id," and the video booth provisions "a constitutional time, place and manner restriction." B.A.P. did not pursue any state law challenges to the licensing ordinance.

Because the "unclean hands" and estoppel defenses, the above-enumerated federal constitutional claims, the claim(s) under Article I, Section 10 of the Missouri constitution, and any related portions of the trial court's judgment are not set forth in a point relied on, any error pertaining to them is deemed abandoned or waived. *Mothershead v. Greenbriar Country Club, Inc.,* 994 S.W.2d 80, 84 (Mo. App. E.D.1999); *Flowers v. Roberts,* 979 S.W.2d 465, 473 (Mo.App. E.D.1998).

**3.** All subsequent ordinance references are to SLCRO 1974, as amended.

female, or the breasts of the female, whether alone, or between members of the same or opposite sex, or between humans and animals in an act of apparent sexual stimulation or gratification. Section 1003.020.3(4)(a) and Section 1003.020.3(4)(b).

B.A.P. operates a business known as California Erotic Novelties [4] (the business) that is located in unincorporated St. Louis County, Missouri, within 1,000 feet of a church. The business sold and rented sexually explicit videotapes, magazines, books, clothing, and novelties. The parties stipulated the business is an "adult business" within the meaning of the zoning and licensing ordinances at issue in this appeal.

In the Spring of 1997, County issued the business a Re–Occupancy Permit and a merchant's license. By letter dated May 13, 1997, County notified the business, which had opened a few weeks earlier, that its Re–Occupancy Permit was revoked. The letter advised the revocation was for violating the zoning ordinance provision prohibiting "an adult business from being located within one thousand (1,000) feet of the property line of any church, school, library, or park, etc."

At the end of May 1997, County filed a lawsuit against B.A.P. By an Amended Petition for Injunction, County sought a permanent injunction against B.A.P.'s operation of the business in violation of County's zoning ordinance, specifically, Section 1003.167.17. B.A.P. filed an answer generally denying liability and setting forth affirmative defenses, along with a Counterclaim for a Declaratory Judgment, Injunction and Damages (Counterclaim).

By its Counterclaim, B.A.P. challenged the location provisions of the zoning ordinance as violating the First and Fourteenth Amendments of the United States Constitution, as well as Article I, Section 8 of the Missouri Constitution. Specifically, B.A.P. alleged that the purpose of those provisions is "to 'zone out' or eliminate adult businesses which have a constitutionally protected right to exist," they do "not further a legitimate and substantial state interest and the alleged studies relied on by [County] are conclusory and speculative at best." B.A.P. further alleged its constitutional right to Free Speech "will continue to be violated" unless the court declares the location provisions in the zoning ordinance unconstitutional and enjoins their enforcement. B.A.P. sought a declaration the location provisions in the zoning ordinance were unconstitutional, an injunction against County's enforcement of those provisions, and an award of damages, attorney's fees, and costs pursuant to 42 U.S.C. Sections 1983 and 1988. County filed a Reply to the Counterclaim in which it generally denied liability.

Through enactment of Ordinance No. 18,548 in July 1997, County amended its "Occupations, Businesses and Licensing" ordinance by adding a new chapter 821 entitled "Sexually Oriented Businesses." We refer to that ordinance as the licensing ordinance. In relevant part, the licensing ordinance states that "[i]t shall be unlawful for any person to own or operate a sexually oriented business without a valid license issued therefor by the Director [of the Department of Revenue or that Director's designee] in accordance with the provisions of this Chapter." Section 821.050.1. The licensing ordinance further provides in relevant part:

[Section] 821.070 Application for License.

\* \* \*

3. No license shall issue for any sexually oriented business if:

(a) The proposed location of said business is within one thousand (1000) lin-

---

**4.** The materials of record also refer to the business as California Exotics and California Exotic Novelties. All of these references are to the same entity, the business we refer to as California Erotic Novelties.

ear feet from any of the following preexisting land uses, which have been determined by the County Council to be inconsistent with the operation of a sexually oriented business, measured in a straight line from the nearest property line to the nearest property line:

(i) An "R" Residence District or "NU" Non–Urban District;

(ii) A regular place of religious worship;

(iii) A public or private school;

(iv) A public or private university or college;

(v) A hospital or nursing home;

(vi) A licensed day care for children;

(vii) A public park;

(viii) A cultural institution, such as a museum; or

(ix) A pre-existing sexually oriented business; ...

* * *

[Section] 821.020. Definitions. – In this Chapter,

* * *

(b) *Sexually oriented business* means any business which offers its patrons goods of which a substantial portion are sexually oriented materials. Any business where more than ten (10) percent of display space is used for sexually oriented materials shall be presumed to be an adult business.

(c) *Sexually oriented material* means any device or any other items intended to provide sexual stimulation or sexual [g]ratification to the customer, including, but not limited to any book, magazine, newspaper or other printed or written matter, picture, drawing, photograph, motion picture film, video, pictorial representation, statue, figure, or other three-dimensional object, recording, transcription or anything which is or may be used as a means of communication that depicts, describes, or portrays human sexual intercourse, sodomy, bestiality, oral copulation, masturbation, urinary and defecatory functions, sadism, masochism, sadomasochistic abuse, exhibition of the genitals or any touching of the genitals, pubic areas, or buttocks of the human male or female, whether alone, or between members of the same or opposite sex, or between humans and animals, in an act of apparent sexual stimulation or gratification.

In August 1997, B.A.P. filed a Petition for a Declaratory Judgment, Injunction and Damages (Petition) challenging the location provisions of the licensing ordinance on federal constitutional grounds. Specifically, B.A.P. alleged the location provisions in the licensing ordinance violate the First and Fourteenth Amendments to the United States Constitution by "unreasonably restrict[ing], if not zon[ing] out entirely, a whole category of protected expression." Additionally, B.A.P. alleged its federal "constitutional rights ... relating to Freedom of Speech ... will continue to be violated unless th[e] court declares that [the location provisions in the licensing] ordinance [are] unconstitutional and enjoins enforcement" of those provisions. B.A.P. sought a declaratory judgment that the location provisions in the licensing ordinance were unconstitutional, void and unenforceable; an injunction against enforcement of those provisions, and an award of damages, attorney's fees, and costs pursuant to Title 42 United States Code Sections 1983 and 1988. County filed an Answer to B.A.P.'s Petition in which County generally denied liability.

By letter dated September 8, 1997, County notified B.A.P. that its application for a Sexually Oriented Business License was denied due to the zoning violation.

After a two day, non-jury trial, on County's Amended Petition, B.A.P.'s Counterclaim, and B.A.P.'s Petition, the trial court filed its Judgment in favor of County on all claims. With respect to County's Amended Petition, the trial court concluded an injunction was appropriate in that B.A.P.'s location was within 1,000 feet of a church, in violation of the zoning ordinance; a

"[t]hreat of irreparable harm to a local government flows directly from violations of local ordinances"; and "[e]stoppel does not lie to prevent issuance of an injunction." The trial court further concluded the location provisions in the zoning ordinance and the licensing ordinance were constitutional because they were content-neutral, were designed to serve a substantial government interest, and left "a constitutionally adequate amount of alternative area in which [B.A.P.] may lawfully operate." Upon finding in favor of County, the trial court issued an "injunction ordering [B.A.P.], its successors, officers, agents, servants, employees and attorneys, and those persons in active concert or participation with [B.A.P.] immediately to cease operating as an adult business within 1000 feet of Calvary Lutheran Church." This appeal followed.[5]

On appeal, B.A.P. contends the trial court erred in granting County a permanent injunction and in denying B.A.P. relief for two reasons. In its first point, B.A.P. argues the location provisions of the zoning and licensing ordinances are "content-based legislation enacted for the predominate purpose of restricting sexually-explicit expression," rather than for the purpose of ameliorating the secondary effects of adult-oriented businesses. In its second point, B.A.P. contends the location restrictions of the zoning and licensing ordinances "fail to provide reasonable alternative avenues of communication." Therefore, B.A.P. argues, the location restrictions in the zoning and licensing ordinances are not constitutional as the trial court concluded, but violate the First and Fourteenth Amendments to the United States Constitution and Article I, Section 8 of the Missouri Constitution.

We affirm the judgment in a court-tried case unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Mullenix–St. Charles Properties, L.P. v. City of St. Charles*, 983 S.W.2d 550, 554–55 (Mo.App. E.D.1998). When reviewing such a judgment, we "accept the evidence and inferences favorable to the prevailing party and disregard all contrary evidence." *Mullenix–St. Charles Properties, L.P.*, 983 S.W.2d at 555. Additionally, while we defer to the trial court's factual findings, because the trial judge is in a superior position to assess credibility, "we independently evaluate the trial court's conclusions of law." *Id.*

The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. Amend. I.[6] Non-obscene sexual expression is protected by the First Amendment. *Sable Communications of California, Inc. v. Federal Communications Comm'n*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). We are assuming from the record that non-obscene sexual materials are the types of materials available at B.A.P.'s business.

While regulations enacted to restrain protected speech based on its content presumptively violate the First Amendment, a government may constitutionally regulate non-obscene sexually explicit expression through "content-neutral" time, place, and manner provisions. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–47, 106 S.Ct. 925, 89 L.Ed.2d

5. The trial court and this Court have denied B.A.P.'s separate Motions for Stay Order Pending Final Disposition on Appeal.

6. Article I, Section 8 of the Missouri constitution provides in relevant part:

 That no law shall be passed impairing the freedom of speech, no matter by what means communicated: that every person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject, being responsible for all abuses of that liberty....

Neither party argues or has directed us to any authority that the free speech requirements of the state constitution differ from those of the federal constitution with respect to the issues under consideration in this appeal. Therefore, we will not separately discuss this state constitutional provision.

29 (1986). To be constitutional under the First Amendment's Free Speech guarantee, such content-neutral time, place, and manner regulations must be designed to serve a substantial government interest and must not unreasonably limit alternative avenues of communication. *Id.* at 47, 106 S.Ct. 925. In *City of Renton*, the United States Supreme Court upheld, as satisfying these requirements, an ordinance prohibiting adult motion picture theaters "from locating within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, or park, and within one mile of any school." *Id.* at 44, 106 S.Ct. 925.

Because the ordinances at issue here do not explicitly ban the existence in unincorporated St. Louis County of adult businesses, such as B.A.P.'s, but merely restrict the location of such businesses, these ordinances may be "properly analyzed as a form of time, place, and manner regulation." *Id.* at 46, 106 S.Ct. 925; *Excalibur Group, Inc. v. City of Minneapolis,* 116 F.3d 1216, 1219–20 (8th Cir. 1997), *cert. denied,* 522 U.S. 1077, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998); *ILQ Invs., Inc. v. City of Rochester,* 25 F.3d 1413, 1416 (8th Cir.), *cert. denied,* 513 U.S. 1017, 115 S.Ct. 578, 130 L.Ed.2d 493 (1994); *Ambassador Books & Video, Inc. v. City of Little Rock, Ark.,* 20 F.3d 858, 863 (8th Cir.), *cert. denied,* 513 U.S. 867, 115 S.Ct. 186, 130 L.Ed.2d 120 (1994); *Holmberg v. City of Ramsey,* 12 F.3d 140, 142 (8th Cir.1993), *cert. denied,* 513 U.S. 810, 115 S.Ct. 59, 130 L.Ed.2d 17 (1994); *Alexander v. City of Minneapolis,* 928 F.2d 278, 282 (8th Cir.1991). Even though the challenged location provisions in the ordinances treat adult oriented or sexually oriented businesses differently than other kinds of businesses, those provisions may be characterized as "content-neutral" if they are aimed at the adverse secondary effects of adult oriented or sexually oriented businesses. *City of Renton,* 475 U.S. at 48, 106 S.Ct. 925.

Whether or not the location provisions in the ordinances were enacted to address any adverse secondary effects of adult oriented or sexually oriented businesses is also significant for purposes of addressing the substantial government interest aspect of the First Amendment analysis of a content-neutral time, place, and manner regulation of protected speech. For instance, in *City of Renton,* the United States Supreme Court found that, by its terms, the challenged ordinance was "designed to prevent crime, protect the city's retail trade, maintain property values, and generally 'protect[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life,'" rather than "to suppress the expression of unpopular views." *Id.* (alterations in original) (quoting Appendix to Jurisdictional Statement 90a). The Supreme Court determined that the city's interest in attempting to preserve the quality of urban life was a "vital government interest[ ]." *Id.* at 50, 106 S.Ct. 925.

The Supreme Court rejected, as "an unnecessarily rigid burden of proof" to impose on the city, the conclusion of the United States Court of Appeals for the Ninth Circuit (Ninth Circuit) that the city needed to justify its ordinance with studies specifically related to Renton's own problems or needs. *Id.* When it enacted the challenged ordinance, the Supreme Court observed, the Renton City Council had before it an opinion of the Washington Supreme Court addressing an ordinance affecting adult movie theaters.[7] *Id.* at 50–51, 106 S.Ct. 925. Holding that Renton was entitled to rely on Seattle's experiences and the findings in *Northend Cinema, Inc., supra,* when it enacted its challenged ordinance, the Supreme Court concluded:

> The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that al-

---

7. *Northend Cinema, Inc. v. City of Seattle,* 90 Wash.2d 709, 585 P.2d 1153 (1978), *cert. de-* *nied,* 441 U.S. 946, 99 S.Ct. 2166, 60 L.Ed.2d 1048 (1979).

ready generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.

*Id.* at 51–52, 106 S.Ct. 925. Additionally, the Supreme Court concluded, the regulation must be " 'narrowly tailored' to affect only that category of [businesses] shown to produce the unwanted secondary effects." *Id.* at 52, 106 S.Ct. 925.

With respect to the reasonable alternative avenues of communication aspect of this First Amendment analysis, the Supreme Court found "the ordinance leaves some 520 acres, or more than five percent of the entire land area of Renton, [consisting of acreage in all states of development and criss-crossed by roads] open to use as adult theater sites." *Id.* at 53, 106 S.Ct. 925. The Supreme Court rejected the argument this land was not "truly 'available' " because some of the land was occupied by existing businesses, little of the undeveloped land was currently available for sale or lease, and generally none of the available acreage was "commercially viable" for adult theaters. *Id.* Specifically, the Supreme Court stated:

> That [the theater owners] must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. [While we have cautioned against zoning regulations that have the effect of suppressing or greatly restricting access to lawful speech,] we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices. . . . [T]he First Amendment requires only that Renton refrain from effectively denying [the theater owners] a reasonable opportunity to open and operate an adult theater within the city, and the

ordinance before us easily meets this requirement.

*Id.* at 54, 106 S.Ct. 925.

■ In its first point, B.A.P. argues County has failed to establish the location restrictions in the ordinances were enacted to address adverse secondary effects, rather than "to prohibit the operation of adult businesses whose inventory consists in whole or in part of presumptively protected, sexually-explicit non-obscene speech." B.A.P. urges County has failed to demonstrate the content-neutrality of the challenged provisions because the legislative history lacks sufficient evidence from which the court may reasonably conclude those ordinances were enacted for the purpose of ameliorating the adverse secondary effects of such businesses. Additionally, B.A.P. contends, the studies on which County relied to substantiate the harm of the secondary effects are not relevant because they focus on a class of adult oriented or sexually oriented businesses different from those targeted by the challenged provisions.

County responds the record clearly demonstrates it enacted the challenged location restrictions in the zoning and licensing ordinances to protect County residents from the negative effects of adult oriented or sexually oriented businesses. Furthermore, County urges, those negative effects were documented by studies from other localities that were obtained by County's professional staff and communicated to the County governing body. Moreover, County argues, the studies need not pertain to the exact businesses regulated by the ordinances.

The legislative history available of record, as well as the testimony and evidence presented at trial, reviewed under the principles set forth in *Murphy* and *Mullenix–St. Charles Properties, L.P., supra,* reveal the following with respect to the enactment of the zoning and licensing ordinances: County's Charter authorizes County to "[e]xercise legislative power pertaining to public health, police . . ., and

planning and zoning" with respect to the unincorporated areas of County, St. Louis County Charter Section 2.180.23, and to "[l]icense, tax, and regulate all businesses, occupations, professions, vocations, activities or things whatsoever set forth and enumerated by the constitution or by statute now or hereafter applicable to St. Louis County," St. Louis County Charter Section 2.180.5.

### Zoning Ordinance

In response to a report an adult gift store was going to be opened in close proximity to a grade school, a member of County's governing body (Council) notified Council members by memorandum, dated October 31, 1994, that he would be introducing "a Resolution which will ask the Planning Commission to hold public hearing[ ]s on an ordinance that ... would prohibit the sale of sexual devices or other sexually explicit materials within 1,000 feet of a school or church." The memorandum noted County did not then have "an ordinance which restricts the location where sexual devices or materials may be sold [and w]hile the County Council lacks the authority to totally prohibit the sale of such sexually related merchandise within the County, [the Council member believed] it is an appropriate exercise of our authority to restrict the locations from where such merchandise may be sold." The Council shortly thereafter approved the resolution.

By letter, dated January 31, 1995, to Council members, Joseph A. Cavato, the Director of County's Department of Planning (Department), reported that Department had met with the Council member who wanted to introduce the ordinance. The Director further reported the matter had thereafter been assigned "to staff for research with the intent of presentation of a preliminary recommendation to the Plan-

ning Commission's Ordinance Review Committee at its ... meeting in mid-February." By memorandum to the Ordinance Review Committee (ORC), dated February 17, 1995, Cavato advised that, on February 21, 1995, the ORC would be discussing "the regulation of the sale of sexual devices or other sexually explicit materials."

Leonard Groszek, who has been a planner with the Department for twenty-seven years and has a master's degree in city and regional planning, was assigned to research this matter. He compiled information from other communities, put together a summary of those studies, and prepared a recommendation. With respect to this assignment, he obtained studies from St. Paul, Minnesota,[8] Indianapolis, Indiana,[9] and Los Angeles, California.[10] Groszek reviewed each of these studies in preparing his report, and testified these studies concluded the presence of adult businesses contributes to neighborhood deterioration, an increase in the crime rate, and a decrease in residential property values in the surrounding areas.

By letter, dated June 7, 1995, Douglas D. Morgan, Chairman of the St. Louis County Planning Commission (Commission), advised the Council that the Commission approved the proposal to amend the zoning ordinance by revising Section 1003.167 "regarding the location of businesses selling sexual devices or other sexually explicit materials." The letter included the Commission's report, which Groszek had prepared, as well as other materials. The report stated in relevant part:

> The goals of the proposed regulations are threefold. First, businesses selling adult oriented items ... would be restricted from locating in close proximity to family oriented uses and/or uses predominantly frequented by minors, such

---

**8.** That study is entitled: *Effects on Surrounding Area of Adult Entertainment Businesses in Saint Paul.*

**9.** That study is entitled: *Adult Entertainment Businesses in Indianapolis.*

**10.** That study is entitled: *Study of the Effects of the Concentration of Adult Entertainment Establishments in the City of Los Angeles.*

as schools, churches, ..., libraries, parks, or residential areas. Second, stores and shops selling the products in question would be dispersed and not be allowed to congregate in an identifiable district or area. Third, the products in question would not be permitted to be openly shown or displayed in any manner visible to the public from the windows of a store or shop.

\* \* \*

The Commission is aware that the operation of adult oriented uses has been found to have a detrimental impact on nearby land uses, especially residential properties. Such finding is based on a review of studies conducted by cities such as Indianapolis, Indiana, Los Angeles, California, and St. Paul, Minnesota which quantify the harmful effects of adult uses on nearby properties and neighborhoods. The Commission is of the opinion that the negative impact of the uses in question provides solid justification to support the recommended amendment to the St. Louis County Zoning Ordinance.

\* \* \*

The Planning Commission believes a number of benefits will be derived from the adoption of the proposed changes. Those benefits include:

— the preservation of strong and viable residential neighborhoods.
— the maintenance of a high quality of life in St. Louis County.
— the prevention of deterioration of commercial use districts.

\* \* \*

In summary, the Planning Commission believes the proposed ordinance amendment relative to the location of businesses engaged in the sale of adult oriented items ... will provide a means for preserving the character and integrity of existing residential areas and family oriented uses and/or uses predominantly

frequented by minors, such as churches, schools, libraries, or parks.

The report also set forth the proposed amendments the Commission recommended. The letter and report were approved by the Commission and the Department, and reflect the Commission's official position. On June 15, 1995, the Council approved the Commission's recommendation and directed the County Counselor to prepare the appropriate legislation. The zoning ordinance was adopted by the Council on June 29, 1995, and approved by the County Executive on July 6, 1995.

*Licensing Ordinance*

In May 1997, after receiving several citizens' complaints regarding movies available at a video store, a Council member introduced proposals for the licensing ordinance. At least three Council members, Groszek, and the County Counselor were among those attending the June 26, 1997, meeting of the Council's Revenue and Personnel Committee (RPC) at which the proposed licensing ordinance was discussed. The RPC's report of that meeting, to which both parties expressly refer in their statements of fact, reflects that the County Counselor advised the RPC his office "had reports of the effects of adult orientated businesses from other areas of the country ... includ[ing] St. Paul, Minnesota, Indianapolis and Los Angeles [and] mentioned other articles which have been gathered discussing the secondary effects of the Sexually–Oriented Businesses." Additionally, Groszek spoke to the RPC about his review of those studies. Specifically, the RPC report reveals:

Mr. Groszek indicated based on the studies the Department had reviewed it was recommending there be a limitation on these types of businesses a distance of 1000 feet from churches, libraries, schools, parks, residential and non-urban properties. Mr. Groszek indicated these studies provided informatioin [sic] that indicated the "Sexually–Oriented Busi-

nesses" do have an adverse effect on these areas.

Mr. Groszek ... referred specifically to the Los Angeles Study. He pointed out this study concluded the "Sexually–Oriented businesses" adversely effect the crime rate and have an adverse economic impact in the areas where they are located. Mr. Groszek also referred to the study from St. Paul, Minnesota and indicated that study concluded there was a correlation between location of adult related businesses and the deterioration of neighborhoods.

Mr. Groszek then referenced the Indianapolis study and indicated this study came to the same conclusions as the others that the adult related businesses tended to increase the crime rate and depress the property values in adjacent areas. . . .

Mr. Groszek again referred to the Indianapolis report. He indicated pages ii and iii summarize the results concluded by the report in connection with the study of Sexually–Oriented Businesses. He specifically referred to page 18 of this report and the comparisons made in the report where sexually oriented or adult entertainment is permitted. Mr. Groszek pointed out on page 26 the report summarizes the findings of the report and on page 51 the report concludes there is an adverse effect on the values on real property as determined by appraisers who studied this issue. In conclusion Mr. Groszek stated these studies provided the information to determine the negative impacts expected from adult oriented or Sexually–Oriented Businesses. These included an increase in the crime rate, depreciation of property values and deterioration of the property in the immediate areas of the businesses. . . .

\* \* \*

In response to Mr. Ross, Mr. Groszek pointed out the areas around Indianapolis and St. Paul compared to the ST. [sic] Louis County Metropolitan area.

\* \* \*

The Prosecuting Attorney of St. Louis County [also] expressed his views on the proposed legislation. . . . [He] explained the crime rate throughout the Country and in St. Louis County is currently dropping. He felt measures that would assist in the rate continuing to drop were essential. [He] stated that based on the studies shown to the Committee, his experiences and the views expressed to him by Prosecutors in other major metropolitan areas that these type[s] of businesses do adversely effect the quality of life or crimes that are referred to as quality of life such as vandalism, littering and this type of thing.

\* \* \*

[One of the Council Members] stated in his view the evidence presented to the Committee as to the detrimental affect on the crime rate, the property values and the deterioration of property as a result of sexually oriented businesses was substantial and persuasive.

The RPC passed a motion recommending "the Council approve the legislation as presented before the" RPC.

By letter, the County Counselor subsequently submitted to the Council certain changes in the proposed licensing ordinance that he had made based on requests made during the RPC's June 1997 meeting. In that letter, the County Counselor also referred to and enclosed a copy of a legislative report completed by a committee of the Houston City Council when that council was considering an ordinance to regulate sexually oriented commercial enterprises, adult bookstores, adult movie theatres, and massage establishments. The County Counselor asked that the Houston, Texas, study be made a part of the record before the RPC. On July 10, 1997, the Council approved the filing of the County Counselor's letter, along with the Houston, Texas, study; "approved and adopted as submitted" the RPC report;

and directed the Council to "pass legislation to license 'Sexually Oriented Businesses.'" On July 17, 1997, the licensing ordinance was adopted by the Council and approved by the County Executive.

The St. Paul, Minnesota, Indianapolis, Indiana, Los Angeles, California, and Houston, Texas studies were admitted into evidence at trial.

Based on this record, we conclude that, in enacting the location provisions in the zoning and licensing ordinances, County relied on evidence of adverse secondary effects of adult oriented businesses or sexually oriented businesses County reasonably believed to be relevant to County's problems. Therefore, these ordinances are both content-neutral and designed to serve a substantial government interest.

■■■ B.A.P. contends the challenged location restrictions in the ordinances restrain speech based on content and presumptively violate the First Amendment because, on their face these ordinances single out adult businesses for more restrictive location requirements than other businesses based on the speech content of the materials offered for sale. We disagree. The fact an ordinance covers only a particular category of business does not make the ordinance "content-based" rather than "content-neutral." *Ambassador Books & Video, Inc.*, 20 F.3d at 863. "[E]ven if a time, place, and manner ordinance regulates only businesses selling sexually explicit materials, the ordinance is content-neutral if its purpose is to lessen undesirable secondary effects attributable to those businesses, such as increased crime, lower property values, or deteriorating residential neighborhoods." *ILQ Invs., Inc.*, 25 F.3d at 1416. Content neutrality focuses on the "purposes in enacting the ordinance." *Id.; see also Excalibur Group, Inc.*, 116 F.3d at 1220; *Holmberg*, 12 F.3d at 142. Thus, if the governing body "targeted not the content of [the adult businesses'] materials, but the anticipated impact of adult businesses on their surrounding communities," then the ordinance may be characterized as

content-neutral. *ILQ Invs., Inc.*, 25 F.3d at 1416.

Here it is clear the Council enacted the location restrictions in the ordinances to address the anticipated impact of adult oriented or sexually oriented businesses on the surrounding areas. Both the Commission's report regarding the zoning ordinance and the RPC's report regarding the licensing ordinance refer to the negative impact the presence of adult oriented businesses or sexually oriented businesses have on surrounding areas. The Commission's report expressly mentions benefits from the zoning ordinance include the preservation of strong residential neighborhoods, the maintenance of a high quality of life, and the prevention of the deterioration of commercial use districts. The RPC's report specifically addresses discussions regarding increased crime rates, the depreciation of property values, and the deterioration of property in the areas surrounding such businesses; and reported at least one Council member found the evidence presented regarding this detrimental impact was "substantial and persuasive." The circumstances leading to enactment of the location provisions in these ordinances reveals the Council was not trying to suppress the protected speech in the materials available at adult oriented or sexually oriented businesses, such as B.A.P.'s business, but was addressing the secondary effects of such businesses. Therefore, we conclude the location restrictions in the ordinances are content-neutral.

■■■ In urging the location restrictions in the ordinances are instead content-based, B.A.P. focuses first on its position the pre-enactment record does not demonstrate the Council "relied" on the studies from St. Paul, Indianapolis, and Los Angeles because: no Council member testified at trial, so there is no direct evidence of reliance; the studies themselves were not provided to Council members or made part of the legislative record; there is no indication any Council member read the stud-

ies; Groszek never said he "relied" on the studies, only that he "reviewed" the studies; no one testified the problems addressed by the studies actually apply to unincorporated St. Louis County; no one demonstrated why St. Louis County compares to St. Paul, Indianapolis, or Los Angeles; and certain statements made during the pre-enactment process indicate the ordinances were being considered to suppress the protected speech available at adult oriented or sexually oriented businesses.[11]

Neither the absence of direct evidence of a Council member's reliance on the studies nor the lack of evidence the Council members actually received or read the studies is sufficient to establish the Council failed to rely on the studies under the circumstances here. While the testimony of a member of the governing body enacting the ordinance may be accorded "substantial weight," [12] such testimony is not essential to a determination whether a governing body considered the adverse secondary effects of adult oriented businesses or sexually oriented businesses. Moreover, as the United States Court of Appeals for the Fifth Circuit has concluded, we discern "no constitutional requirement that the council members personally physically review the studies of secondary effects; such a holding would fly in the face of legislative reality." *Lakeland Lounge of Jackson, Inc. v. City of Jackson, Miss.*, 973 F.2d 1255, 1259 (5th Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 469 (1993); *accord Threesome Entertainment v. Strittmather,* 4 F.Supp.2d 710, 719 (N.D.Ohio 1998) (the court noted it is not "necessary for municipal legislators themselves to actually review specific studies of secondary effects, so long as they receive recommendations from knowledgeable persons").

Here, the Department and its staff, as well as the RPC, acting at the direction and on behalf of the Council, studied and considered proposed ordinance language prior to enactment, and then submitted proposed ordinances, with recommendations, for the Council's consideration. The record reveals this process included the receipt and consideration of three studies from St. Paul, Indianapolis, and Los Angeles. Additionally, with respect to the licensing ordinance, it is clear from the RPC report that at least three Council members discussed and evaluated the applicability of those studies when addressing the proposed ordinance. Thus, the Council's purported failure to rely on the secondary effects of adult oriented or sexually oriented businesses is not established by the absence of direct evidence from Council members, by the absence of evidence the Council members actually reviewed each study, or by the absence of the actual studies from the available legislative record.

Groszek's arguable failure to state in court that he "relied" on each of the three studies also is not persuasive. It is clear from the record he obtained, reviewed and used the studies in reaching his conclusions and recommendations, both in the report he prepared for the Commission and in his presentation to the RPC. Additionally, the County Counselor clearly reported to the RPC that he had analyzed the studies when considering the licensing ordinance proposal.

 B.A.P. also urges we find the location restrictions in the ordinances are content-based because no one testified the problems addressed by the studies actually apply to unincorporated St. Louis County, and no one demonstrated how St. Louis County compares to St. Paul, Indianapolis, or Los Angeles. To ascertain content neu-

---

11. Because we find the Council considered at least one, if not more than one, relevant study during the pre-enactment process, we do not address B.A.P.'s contention County may not use studies obtained after enactment to establish the purposes of the ordinances.

12. *Thames Enterprises, Inc. v. City of St. Louis,* 851 F.2d 199, 202 (8th Cir.1988).

trality, there is no requirement that County prove any adult oriented or sexually oriented businesses in the county cause adverse secondary effects. *ILQ Invs., Inc.,* 25 F.3d at 1416. County need not wait for problems pertaining to adult businesses to exist before addressing them. As the United States Court of Appeals for the Tenth Circuit has stated: the legislature "need not wait for sexually oriented businesses to ... depress property values, increase crime, and spread sexually transmitted diseases before it regulates those businesses.... [The legislature] may control a perceived risk through regulation." *Z.J. Gifts D-2, L.L.C. v. City of Aurora,* 136 F.3d 683, 688 (10th Cir.), *cert. denied,* 525 U.S. 868, 119 S.Ct. 162, 142 L.Ed.2d 133 (1998). The United States Court of Appeals for the Eighth Circuit (Eighth Circuit) concurs with this perspective. "To insist that governmental interests justifying [adult business] legislation could only be found in specific local experiences and conditions would be unrealistically to require deliberate subjection to those experiences and conditions before attempting to avoid them." *Postscript Enterprises v. City of Bridgeton,* 905 F.2d 223, 227 (8th Cir.1990) (internal quotation marks omitted) (quoting *Wall Distribs., Inc. v. City of Newport News, Va.,* 782 F.2d 1165, 1169–70 n. 7 (4th Cir.1986)).

Furthermore, we note there is an indication in the RPC report that Groszek found St. Louis comparable to St. Paul and Indianapolis. To the extent we may address the propriety of such a comparison when considering a Free Speech challenge, B.A.P. has not demonstrated any basis for finding that comparison questionable or inappropriate.

B.A.P. additionally contends certain statements made during the pre-enactment process reveal the ordinances were enacted to suppress protected expression rather than to address the adverse secondary effects of adult oriented or sexually oriented businesses. We, "normally do not look behind legislative findings and policy statements to attempt to discern the hidden (as distinguished from the stated) purpose of the legislation." *Ambassador Books & Video, Inc.,* 20 F.3d at 863. In *City of Renton,* the United States Supreme Court rejected the Ninth Circuit's view that an ordinance is invalid if "a motivating factor" in enacting the ordinance was the restriction of the exercise of First Amendment rights. *City of Renton,* 475 U.S. at 47, 106 S.Ct. 925. Rather, the Supreme Court found, if the predominant intent of the legislative body in passing the ordinance is unrelated to the suppression of Free Speech, the ordinance may be characterized as content neutral. *Id.* at 48, 106 S.Ct. 925. Based on the record before us, we conclude the predominant intent of County in enacting the location provisions of the zoning and licensing ordinances was to address adverse secondary effects resulting from the presence of adult oriented or sexually oriented businesses. Specifically, County was addressing the neighborhood deterioration, increased crime rates, and decreased property values that may result from the presence of such businesses.

Finally, B.A.P. relies heavily on *N.W. Enterprises, Inc. v. City of Houston,* 27 F.Supp.2d 754 (S.D.Tex.1998), to support its position that the challenged location provisions, particularly those in the licensing ordinance, are unconstitutional. We find that case distinguishable. In *N.W. Enterprises, Inc.,* the court addressed challenges to ordinance provisions increasing location restrictions on adult businesses and concluded the provisions were not content neutral. *Id.* at 771, 811. The court noted the question was whether the City Council had before it "even a minimal threshold amount of evidence upon which a reasonable Council member *could have* relied in determining whether the purported negative secondary effects actually exist and whether the amendment to the Ordinance would somehow help alleviate those effects." *Id.* at 801. The court "concluded [after a thorough examination of the legislative record presented by the City] that the City's decision ... was not based on any evidence of secondary effects." *Id.*

Instead, the court found, the "City's justification for the [amendments] rests entirely on the availability of alternative sites." *Id.* at 802. The court noted,

> The record created in support of [the] Ordinance ... contains only a handful of vague references to, and other conclusory testimony regarding, the effects sexually oriented businesses have on surrounding areas....
>
> * * *
>
> ... However, no [studies or verification of statistical or other information stated by a resident as shown in several studies were] included in the legislative record; nor is there any indication that the City's Legal Department, the other Council members or even the other [Sexually Oriented Business] Committee members ever obtained the material.

*Id.* at 805.

Here, we have concluded the Council properly addressed the adverse secondary effects of adult businesses, considered studies regarding such effects in other cities, and enacted the challenged location provisions to ameliorate those secondary effects. Therefore, we find *N.W. Enterprises, Inc.* is not persuasive here.

■ B.A.P. alternatively argues the three studies are not relevant because the studies do not address either businesses having less than a substantial portion of their business in adult oriented or sexually oriented materials or businesses that purvey take-home materials rather than materials for on-premises enjoyment. In support of this argument, B.A.P. has cited cases concluding the studies relied on by the legislative body must address business activity that is nearly identical to that regulated by the ordinance. *See, e.g., World Wide Video, Inc. v. City of Tukwila,* 117 Wash.2d 382, 816 P.2d 18, 20 (banc 1991), *cert. denied,* 503 U.S. 986, 112 S.Ct. 1672, 118 L.Ed.2d 391 (1992); *Sebago, Inc. v. City of Alameda,* 211 Cal.App.3d 1372, 259

Cal.Rptr. 918, 924 (1989); *Wolff v. City of Monticello,* 803 F.Supp. 1568 (D.Minn. 1992).

We, however, agree with other courts, including the Eighth Circuit, that do not require exact identity between the types of businesses studied by the legislative body and plaintiff's adult business or all the adult businesses regulated by the challenged ordinance. In *ILQ Invs., Inc.,* the Eighth Circuit rejected as unsupported the district court's conclusion that the city unreasonably relied on studies focusing on businesses dissimilar to plaintiff's business, an "adult bookstore[ ] 'that offer[s] both sexually explicit and non-sexually explicit materials and allow[s] only off-premises consumption of those materials.'" *ILQ Invs., Inc.,* 25 F.3d at 1417. The Eighth Circuit found the studies "identified and measured adverse secondary effects linked to adult businesses generally – higher crime, neighborhood deterioration, lower property values, and an increase in transients – as well as adverse secondary effects *specifically attributable to adult bookstores.*" *Id.* at 1417–18. The studies relied on included the St. Paul and Indianapolis studies. *Id.* at 1418. The court specifically noted "[t]he Indianapolis study included a national survey of real estate appraisers" regarding the effect of the presence of adult bookstores on surrounding properties; and the St. Paul study included a neighborhood having the only adult bookstore, and described discarded literature found on property near the adult businesses that then becomes available to minors, who are otherwise prohibited from receiving the material from plaintiff.[13] *Id.* at 1418.

The Eighth Circuit held the law does not require, as plaintiff argued, that the city "was constitutionally required to disregard these studies because none evaluated the secondary effects of a bookstore offering non-adult as well as adult materials and

---

13. The record in this case reflects that discarded material from B.A.P.'s business was found on the ground near a day care center.

having no facilities for on-premises consumption." *Id.* Under *City of Renton,* the Eighth Circuit concluded, the city did not need to prove plaintiff's business

> would likely have the exact same adverse effects on its surroundings as the adult businesses studied by Indianapolis [and] St. Paul.... So long as [the ordinance] affects only categories of businesses reasonably believed to produce at least some of the unwanted secondary effects, [the city] "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion).
>
> [The city] relied upon studies that identified specific adverse secondary effects attributable to adult bookstores. The City reasonably believed that evidence was relevant to the problems addressed by [the ordinance]. Even if [plaintiff's business] is a new type of adult business, it may not avoid time, place, and manner regulation that has been justified by studies of the secondary effects of reasonably similar businesses.

*ILQ Invs., Inc.,* 25 F.3d at 1418 (footnote omitted). *Accord, Z.J. Gifts D–2, L.L.C.,* 136 F.3d at 687 (concluding "differences in the mode of delivery of sexually oriented materials are constitutionally insignificant for purposes of determining an ordinance's content-neutrality" and finding "the record fully supports the city's regulation of sexually oriented businesses providing both on- and off-site viewing of sexually explicit materials"); *Ben Rich Trading, Inc. v. City of Vineland,* 126 F.3d 155, 162 (3rd Cir.1997) (finding "the relevant cases do not impose a requirement that [the city] lay out in specific detail how its situation is sufficiently similar to [those jurisdictions conducting studies on which the city relied] in order to make their studies relevant").

Based on this case law and the available record, we reject B.A.P.'s argument that the studies on which County relied are irrelevant to the location provisions under consideration by the Council.

■ We also conclude the location provisions in the ordinances address a substantial government interest. As the Eighth Circuit has noted, regulations reasonably designed to ameliorate unwanted secondary effects of sexually oriented businesses serve a substantial government interest. *Excalibur Group, Inc.,* 116 F.3d at 1220; *ILQ Invs., Inc.,* 25 F.3d at 1416. Here, County enacted the challenged location provisions to maintain the quality of life in unincorporated St. Louis County; and to curb the detrimental effect adult businesses have on the crime rate, property values, and the deterioration of property in the areas surrounding such businesses. As the United States Supreme Court has observed, preserving the quality of life through the prevention of crime and maintenance of property values is a "vital government interest[ ]." *City of Renton,* 475 U.S. at 50, 106 S.Ct. 925.

■ Furthermore, the ordinance is narrowly tailored sufficiently to satisfy the Free Speech guarantee. This requirement is satisfied as long as the regulation promotes a substantial government interest that, absent the regulation, would be achieved less effectively, and the chosen means does not burden substantially more speech than necessary to further that government interest. *Excalibur Group, Inc.,* 116 F.3d at 1221; *ILQ Invs., Inc.,* 25 F.3d at 1418. A content-neutral time, place, and manner regulation will not be struck down because a less restrictive or more effective means of furthering the government's objectives may be discerned. *Excalibur Group, Inc.,* 116 F.3d at 1221.

■ Here, the record reveals County did not have either a zoning ordinance or a licensing ordinance focusing on adult oriented or sexually oriented businesses until these ordinances were enacted. The substantial government interest in preserving the unincorporated County's quality of life is clearly achieved more effectively with

the enactment of the location restrictions in these ordinances. Moreover, the ordinances apply only to "any business which offers its patrons goods of which a substantial portion are adult oriented materials or services relating to such items," Section 1003.167.17, or "any business which offers its patrons goods of which a substantial portion are sexually oriented materials," Section 821.020(b). Thus, they do not burden substantially more speech than necessary and are narrowly tailored for purposes of the Free Speech analysis.

■ B.A.P. urges the restrictions are not narrowly tailored because they encompass businesses having less than a substantial portion of adult oriented or sexually oriented goods offered to customers. This argument arises out of two statements in the ordinances. The zoning ordinance states: "[a]ny business where more than twenty-five (25) percent of the retail value of merchandise offered for sale consists of adult oriented items shall be presumed to be an adult business." Section 1003.167.17. The licensing ordinance states: "[a]ny business where more than ten (10) percent of display space is used for sexually oriented materials shall be presumed to be an adult business." We interpret these statements as setting forth rebuttable presumptions that do not alter the clear mandate of each ordinance that, in order to fall within the terms of the ordinances, a business must "offer[ ] its patrons goods of which a substantial portion are" either adult oriented materials and related services for purposes of the zoning ordinance or sexually oriented materials for purposes of the licensing code.

Point one denied.

■ In its second point, B.A.P. argues the location restrictions in the zoning and licensing ordinances fail to provide reasonable alternative avenues of communication. B.A.P. urges we must ascertain how many "potentially available" sites exist after application of the location restrictions in light of factors and analysis set forth in *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524 (9th Cir.1993), *cert. denied*, 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994). Considering the amount of sites available as a portion of the total land available in unincorporated St. Louis County, B.A.P. urges the location restrictions in the zoning and licensing ordinances violate the constitutional guarantee of Free Speech.

County responds that, to the extent B.A.P. is contending the trial court should have believed B.A.P.'s expert rather than County's expert, the argument is not persuasive under the principles guiding review of a judgment following a non-jury trial. Additionally, recognizing there is no "bright line minimum amount" of area that satisfies constitutional Free Speech requirements, County argues the number of sites available in unincorporated St. Louis County exceeds the demand for such sites. Therefore, County urges, the location restrictions satisfy the reasonable alternative avenues of communication element of Free Speech analysis.

■ The fact the adult business owner is not able to "secure property meeting his economic or commercial criteria does not render" the ordinances invalid. *Alexander*, 928 F.2d at 284. This part of the Free Speech inquiry is not focused on the economic impact on the adult business. *Id.* at 283. Therefore, the adult business's cost of relocation is not a factor. *Ambassador Books & Video, Inc.*, 20 F.3d at 864–65; *Holmberg*, 12 F.3d at 144. Nor is it relevant "that no one would sell or lease property on which [the adult business owner or operator] could relocate [the] business." *Alexander*, 928 F.2d at 283. As the United States Supreme Court stated: the fact the adult business owner or operator must fend for itself "in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation." *City of Renton*, 475 U.S. at 54, 106 S.Ct. 925.

■ Importantly, in considering availability, we are mindful that there is no constitutional requirement that a specific

proportion of land or a certain number of sites be available to adult businesses to satisfy this element of Free Speech analysis. *Lakeland Lounge of Jackson, Inc.,* 973 F.2d at 1260; *accord North Ave. Novelties, Inc. v. City of Chicago,* 88 F.3d 441, 445 (7th Cir.1996) ("The constitution does not mandate that any minimum percentage of land be made available for certain types of speech"), *cert. denied,* 519 U.S. 1056, 117 S.Ct. 684, 136 L.Ed.2d 609 (1997). Moreover, for purposes of this free speech analysis, it is appropriate to consider the proportion of commercially zoned land, rather than the proportion of all land, available to the adult businesses. *Holmberg,* 12 F.3d at 144 (noting the percentage of "land zoned for commercial uses" that was available to sexually oriented businesses); *Alexander,* 928 F.2d at 283 (noting the land available to adult theaters as a percentage of the "total acreage of commercial land"); *accord Topanga Press, Inc.,* 989 F.2d at 1531 ("Fifth, and most obvious, those relocation sites which are commercially zoned are part of the market").

Based on these principles and a review of the available record, we find the location restrictions in the zoning and licensing ordinances provide reasonable alternative avenues of communication.

Thomas Curran, an employee of the Transportation and Redevelopment Policy Division of County's Planning Department,[14] testified regarding his analysis of the sites available in unincorporated St. Louis County after application of the location restrictions in the zoning and licensing ordinances. He concluded there are 3,066.7 acres zoned commercial in unincorporated St. Louis County, 230.25 acres (or seventy-seven parcels) are available that comply with the location restrictions in the zoning code and 104.3 acres (or twenty-three parcels) are available that comply with the location restrictions in the licensing code.

He physically went to each site and learned from their appearance that the majority of them are occupied by commercial enterprises, there are approximately ten sites that are vacant and/or have signs stating they are available for sale or lease, and all sites are served by roadways and utilities.

B.A.P.'s expert, Gary P. Crabtree, a planning and zoning consultant who worked for County's Planning Department from 1972 to 1986, acknowledged that each of the sites to which Curran testified is suitable for some commercial use. Crabtree, however, excluded certain sites that were used or built for special uses, i.e., the Rams football team's practice field, a Harley House hotel site, certain office building sites, a warehouse, gas stations, certain restaurant sites, a motel, and a medical facility. He also testified that an amount of this commercially zoned land may fall under a Planned Commercial District which restricts uses within the district until the zoning designation is changed through appropriate channels. In his view, only sixty acres were available under the location restrictions of the zoning ordinance and only forty acres were available under the location restrictions of the licensing ordinance. He did not know how many sites were available on those acres.

A detective with the Bureau of Special Investigations for the St. Louis County Police Department testified that B.A.P.'s business was the only adult business operating in St. Louis County's unincorporated area, although there had been one other similar business that had recently closed.[15]

The trial court used Curran's figures when ascertaining the availability of sites in unincorporated St. Louis County. Nothing of record persuades us that Curran's analysis was based on improper information or inappropriate methodology, or is any manner not credible. Furthermore, it appears that Crabtree may have

14. Curran has a bachelor's degree and a master's degree in Urban Affairs, and has worked for County for seven years.

15. The detective further noted there was another business that sold mostly clothing and, therefore, she did not believe it fell within the ordinances' definitions of adult business.

eliminated from Curran's totals some otherwise available sites. In and of itself, the present use of a site by a commercial or other enterprise does not foreclose consideration of the site as available for purposes of this part of Free Speech analysis. Even if we, like the United States Court of Appeals for the Ninth Circuit in *Topanga Press, Inc., supra,* found it appropriate to consider some sites unsuitable because of long term dedicated uses or the presence of warehouses, the record before us does not clearly establish which of any of the sites Curran found available are subject to such uses or structures. Moreover, Crabtree acknowledged each of the sites identified by Curran is suitable for some commercial use and did not contest Curran's assessment that each of the available sites is accessible to the public; has infrastructure, including utilities; and is within commercially zoned districts.

We are not persuaded by B.A.P.'s argument the only proper analysis is a comparison of available sites to total land area and that more than twenty-three sites are required to satisfy the constitutional Free Speech guarantee. Courts have found constitutionally valid ordinances that have location restrictions providing twenty-six sites for relocation, *International Eateries of America, Inc. v. Broward County, Fla.,* 941 F.2d 1157, 1165 (11th Cir.1991), *cert. denied,* 503 U.S. 920, 112 S.Ct. 1294, 117 L.Ed.2d 517 (1992), and those that provide eleven to sixteen sites for relocation, *3570 East Foothill Blvd., Inc. v. City of Pasadena,* 980 F.Supp. 329, 341–43 (C.D.Cal. 1997). Based on the available record, we conclude the twenty-three sites provide more than reasonable alternative avenues of communication for B.A.P.'s adult business. Point two denied.

Judgment affirmed.

WILLIAM H. CRANDALL, Jr., P.J. and KENT E. KAROHL, J.: Concur.