2003 UT 26

**MIDVALE CITY CORPORATION,**
Plaintiff and Appellee,

v.

**John HALTOM, an individual, and Doctor John's, Inc., dba Doctor John's Lingerie and Novelty Boutique, Defendants and Appellants.**

No. 20010794.

Supreme Court of Utah.

May 16, 2003.

Rehearing Denied July 2, 2003.

⚷82(6.1)

⚷90(3)

⚷48(1)

Peter Stirba, Corbin B. Gordon, Benson L. Hathaway, Salt Lake City, for plaintiff.

John Fahle, San Antonio, Texas, and W. Andrew McCullough, Midvale, for defendants.

JACKSON, Judge:

¶1 Defendants John Haltom and Doctor John's, Inc. (Dr. John's) appeal the trial court's issuance of a permanent injunction prohibiting Dr. John's from doing business in Midvale City. We affirm.

¶ 2 Associate Chief Justice Durrant, Justice Russon, and Justice Wilkins concur in Judge Jackson's opinion. However, Associate Chief Justice Durrant, joined by Justice Russon and Justice Wilkins, writes separately to set forth an alternative rationale for denying Dr. John's facial challenge, to address Dr. John's "as applied" challenge, and to clarify that the "good cause" exception does not need to be severed or given a limiting construction at this time.

## BACKGROUND

¶ 3 The operative facts of this case are undisputed. Defendants, acting primarily through John Haltom (Haltom), commenced business in Midvale City as Dr. John's Lingerie and Novelty Boutique (Dr. John's) in June of 2000, and applied for a commercial business license.

¶ 4 On June 14, 2000, Haltom filled out an application where he described his business as selling "lingerie, swimwear, roses & gifts." On June 15, 2000, Susan Shreeve (Shreeve), the Midvale City Business License Administrator, asked Haltom for a definition of the novelties he intended to sell at his business. Haltom described such items as "candles and lotions." He failed to mention a legion of sexual devices and hundreds of associated products.

¶ 5 On June 28, 2000, Shreeve visited Dr. John's on a business license inspection as scheduled by Haltom, and decided that some of the novelties constituted sexually oriented products as defined by the Midvale City Code. Shreeve admonished Haltom to apply for a sexually oriented business (SOB) license, and revealed that she could not approve his current business license, presumably because he had affirmatively misrepresented the items he was going to sell. On July 29, 2000, Dr. John's began operating without a business license.

¶ 6 On August 8, 2000, the district court entered a Temporary Restraining Order that prohibited defendants from operating. On the same date, the parties appeared, were represented by counsel, and reached a specific agreement, as reflected in the order, that if "Haltom remov[ed] the product lines which

[were] considered sexual[ly] oriented as described in the SOB ordinance, ... the City [would] not take further action in terms of the business operating and [would] consider the operation pursuant to the general business license application submitted on June 14, 2000."

¶ 7 For a brief time after the issuance of the Temporary Restraining Order, defendants removed all inventory covered by the ordinance, were issued a license, and continued to operate. On October 2, 20, and 24, and November 7, 2000, Midvale's City Code Enforcement Officer, Vicki Siegal, made inspections of Dr. John's and observed several hundred sexual gratification devices.

¶ 8 On November 21, 2000, the trial court held a hearing wherein it determined that Dr. John's was doing business as an SOB without an SOB license. Since defendants never submitted an application to Midvale City for an SOB license, the trial court issued a permanent injunction prohibiting it from doing business in Midvale City. Dr. John's appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 9 Dr. John's presents four challenges to the trial court's injunction. First, it challenges the trial court's determination that Midvale City's SOB ordinance was not unconstitutionally vague or overbroad. Second, it challenges the trial court's determination that injunctive relief is an available remedy in this case. Third, Dr. John's challenges the trial court's determination that the ordinance in question is a valid time, place, and manner restriction. Fourth, Dr. John's challenges the trial court's determination that the Utah Constitution does not offer broader protection than the United States Constitution.

¶ 10 These are all questions of law that we review for correctness. *See Grand County v. Emery County,* 969 P.2d 421, 422 (Utah 1998) (holding a trial court's conclusion that a statute or ordinance is constitutional presents a question of law reviewed for correctness); *Alta v. Ben Hame Corp.,* 836 P.2d 797, 804 (Utah Ct.App.1992) (determining availability of injunctive relief as matter of law); *Whitmer v. City of Lindon,* 943 P.2d 226, 228

(Utah 1997) (reviewing trial court's ruling on state constitutional claims for correctness).

## ANALYSIS

¶ 11 We are called upon to decide whether a municipality may classify certain businesses as sexually oriented businesses, and require them to apply for a different license prior to engaging in business. There is no constitutional right to be free from classification. Accordingly, we hold that a city may classify businesses without implicating the First Amendment as long as the licensing process at issue does not adversely affect such businesses.

## I. STANDING

■ ¶ 12 We first discuss whether Dr. John's had standing to file suit. The district court made no factual findings that could support standing, and after careful review, it appears that this issue is dispositive. "[I]t is the burden of the 'party who seeks the exercise of jurisdiction in his favor' [to clearly allege] facts essential to show jurisdiction. If [it] fail[s] to make the necessary allegations, [it has] no standing." *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990) (citations omitted).

¶ 13 Because of the unique manner in which this case arose, the issue of standing is somewhat complicated. The issuance of an injunction conferred standing on Dr. John's as to licensing, and in effect, the constitutional challenge was bootstrapped in light of the dispute regarding classification. In essence, Dr. John's argues that unbridled discretion as to classification bears some relation to unbridled licensing discretion. We disagree.

■ ¶ 14 A claim of prior restraint, valid or not, properly elicits a court's attention. "[T]he judiciary is vigilant in its oversight of prior restraints because of the fear that they deprive or delay access to information, and because restraints that lack procedural safeguards may lead to content-based discrimination." *Graff v. City of Chicago,* 986 F.2d 1055, 1063 (7th Cir.1993) (en banc). "While [p]rior restraints are not unconstitutional per se ... [a]ny system of prior restraint ...

comes to [the Court] bearing a heavy presumption against its constitutional validity." *FW/PBS, Inc.,* 493 U.S. at 225, 110 S.Ct. at 604 (citations omitted) (first and second alteration in original).

■ ¶ 15 A facial challenge is permitted where the licensing system "is directed narrowly and specifically at expression or conduct associated with expression," *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 760, 108 S.Ct. 2138, 2145, 100 L.Ed.2d 771 (1988), because when a licensing scheme implicates protected speech, "applicants [may] be intimidated into censoring their own speech by not applying for a license," *Graff,* 986 F.2d at 1073.

■ ¶ 16 "[A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood,* 486 U.S. at 759, 108 S.Ct. at 2145. "To a large extent, then, one's ability to mount a facial challenge depends on the resolution of the substantive questions of whether speech is implicated and whether decision makers have excessive authority." *Graff,* 986 F.2d at 1061.

■ ¶ 17 Even when a licensing scheme does not directly suppress communication, courts may properly entertain a facial challenge "where the licensing scheme vests unbridled discretion in the decisionmaker [or fails to confine the time in which a decision is made] and where the regulation is challenged as overbroad." *FW/PBS, Inc.,* 493 U.S. at 223, 110 S.Ct. at 603 (citing *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 798 & n. 15, 104 S.Ct. 2118, 2125 & n. 15, 80 L.Ed.2d 772 (1984)).

■ ¶ 18 Still, courts are reluctant to entertain facial attacks because the statute may be declared unconstitutional in all instances. "The usual approach is to wait until a statute is applied in the suspected and offensive way." *Graff,* 986 F.2d at 1072 (citing *FW/PBS, Inc.,* 493 U.S. at 223, 110 S.Ct. at 603); *see also City of Lakewood,* 486 U.S. at 774, 108 S.Ct. at 2153 (White, J., dissenting).

"[W]e cannot sustain [a] facial attack unless the ordinance is 'substantially overbroad,' judged in relation to the statute's plainly legitimate sweep." *FW/PBS, Inc.*, 493 U.S. at 259, 110 S.Ct. at 622 (Scalia, J., dissenting) (citations omitted).

¶ 19 Thus, there are two ways in which an appellant can attain standing: (1) He can raise an overbreadth challenge, alleging either impermissible time restraints or unbridled discretion; or (2) he can raise an as-applied challenge, alleging that the ordinance as applied has harmed or is likely to harm his interests. Both attempts fail in this case.

¶ 20 First, Dr. John's cannot mount a facial challenge because, even in the most restrictive light, the statute only regulates the type of license for which one must apply. To mount a facial attack in a prior restraint case, an appellant must demonstrate that the ordinance at issue restricts, or will restrict, communication in some discernible manner. Dr. John's offers no evidence that the purpose of the ordinance is "to restrict stores, as opposed to addressing the secondary effects of such stores." *The Pack Shack, Inc. v. Howard County*, 138 Md.App. 59, 770 A.2d 1028, 1034 (2001).

¶ 21 Even if Dr. John's had demonstrated unbridled discretion, it must also show that it suffered more onerous treatment or adverse consequences than a regular commercial establishment. Otherwise, its challenge must fail.[1] "An injury-in-fact is an ' "invasion of a legally protected interest" that is (a) concrete and particularized and (b) actual or imminent, i.e., not conjectural or hypothetical.' ... Causation requires a showing that the injury is ' "fairly trace[able] to the challenged action of the defendant." ' " *Z.J. Gifts v. City of Littleton*, 311 F.3d 1220, 1226 (10th Cir.2002) (alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)).

¶ 22 Dr. John's best argument is that it is "engage[d] in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (1979) (noting that standing exists when fear of criminal prosecution under allegedly unconstitutional statute is not imaginary or wholly speculative). The record indicates that the city attempted to enforce the ordinance against Dr. John's. The record also indicates, however, that had Dr. John's applied for the correct license he would have received one.

¶ 23 While normally, "[a]pplying for and being denied a license ... is not a condition precedent to bringing a facial challenge to an unconstitutional law," it is a central factor where the law presents no constitutional concerns. *ACORN v. Municipality of Golden*, 744 F.2d 739, 744 (10th Cir.1984). Thus, Dr. John's standing turns on problems arising from the application for an SOB license.

¶ 24 Dr. John's has not alleged any harm arising from the licensing proceedings except for the classification of the business as an SOB. It is thus "pure conjecture" that any harm will flow from this classification. *See Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1280 (10th Cir.2002) (holding adult business did not have standing to challenge a city's provisions for granting a license because the business faced no adverse effects). Dr. John's may not manufacture standing by refusing to apply for the proper license simply because he disagrees with the preapplication process of classification. Ultimately, Dr. John's fails to allege that he will suffer any harm from the classification or the licensing process itself, and the record is devoid of anything that might affect Dr. John's.

¶ 25 Absent evidence that the classification functions as some governmental mark of Cain, the licensing requirements are constitutionally sound because they have no effect on businesses. "An ordinance requiring applicants to 'divulge such personal infor-

---

1. A plaintiff may have standing if an ordinance has a deterrent effect on legitimate expression. However, he may not manufacture standing, as Dr. John's has here, by picking a fight about proper classification.

mation as full name, height, weight, hair color, eye color, date of birth, current residential address, and all residential addresses for the prior three years' further[s the] 'substantial governmental interest in eradicating the secondary effects of sexually oriented businesses' " and does not violate the First Amendment. *Déjà Vu of Cincinnati v. Union Township*, 326 F.3d 791, 2003 U.S.App. LEXIS 7720, 2003 FED App. 0122P (6th Cir.2003) (quotations and citations omitted).

¶ 26 The issues of discretionary classification and licensing may appear inextricably intertwined. Discretionary classification, however, does not implicate First Amendment protection, and discretionary licensing does so only when the process itself threatens some type of restriction on communication. The Midvale ordinance threatens no restriction whatsoever, save for the issuance of a different business license. "[T]he city does not exercise discretion by passing judgment on the content of any protected speech. Rather, the city reviews the general qualifications of each license applicant, a ministerial action that is not presumptively invalid." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 229, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990).

¶ 27 In sum, Dr. John's does not have standing to mount a facial attack on the Midvale ordinance because it has not shown that the ordinance has any deterrent effect on expression.[2] The Midvale ordinance requires a sexually oriented business to complete a business license application truthfully. Nothing in the record suggests that the ordinance restricts anything besides business owners who would operate without a license.

## II. OVERBREADTH AND VAGUENESS CLAIMS

¶ 28 Although standing is dispositive, we will analyze Dr. John's constitutional arguments insofar as they have been raised and insofar as Chief Justice Durham addresses them in her dissent.

### A. Sexual Novelties as Expressive Conduct

#### 1. Level of Scrutiny

■ ¶ 29 Dr. John's argues that the sexual novelties at issue here amount to expressive conduct protected by the First Amendment. The trial court assumed arguendo that marginal protection applied to proceed with the substantive analysis. It is far from clear, however, that the sale of sexual devices deserves any First Amendment protection. Whatever the intellectual attraction may be in treating sexual devices as marginally protected "symbolic speech," it is clear from Haltom's testimony that Dr. John's interest in selling the products was purely commercial. A product's mere shock value does not trigger protected speech considerations, especially where the challenger would use the First Amendment as a prophylactic shield against valid government licensing regulations. The district court's use of mid-level scrutiny was thus overly generous to Dr. John's.

¶ 30 As the district court held, absent some perceptible communicative or expressive function, the sexually oriented novelties should be examined using the lowest level of scrutiny afforded commercial speech. This would place the analysis squarely within the well-established *Hoffman* framework and defeat any claims of vagueness or overbreadth because the ordinance implicates no constitutionally protected conduct. *See generally Hoffman Estates v. Flipside*, 455 U.S. 489, 497, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Dr. John's has failed to demonstrate any speech interest in the products it sells, and in fact affirmatively denied such an interest.[3]

2. What Dr. John's actually challenges is the ability of a single city official to choose what kind of business license Dr. John's must have. While it is not clear on what grounds Dr. John's might challenge this aspect of Midvale's business licensing scheme, we are certain it has precious little to do with the Constitution of the United States.

3. Indeed, any message of sexual expression or freedom is clearly secondary to the sale and subsequent use of the products. Whatever communicative aspects a sexual device might convey to its potential purchaser, its emotive impact is certainly incidental to its purchase and primary use. Justice Scalia's comment in *Pap's A.M.* is instructive: The statute was constitutional " 'not because it survive[d] some lower level of First

Accordingly, we decline to infer a communicative purpose in these products. Whatever level of speech or communicative quality may lie hidden in the sexual novelties Dr. John's sells, the government may require that Dr. John's apply for and receive a valid business license.

### 2. Symbolic Speech and Mid–Level Scrutiny

¶ 31 The United States Supreme Court has noted that certain sexually expressive items and conduct are "entitled to some quantum of protection under the First Amendment." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 285, 120 S.Ct. 1382, 1388–89, 146 L.Ed.2d 265 (2000). The items sold at Dr. John's, however, are at best "symbolic speech," falling within the "outer ambit of the protection" and subject to evaluation under the *O'Brien* framework. *See United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). "[T]he sordid business of pandering is constitutionally unprotected—. . . the sale of material solely to produce sexual arousal . . . does not escape regulation because the [material] has been dressed up as speech, or in other contexts might be recognized as speech." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225–26, 110 S.Ct. 596, 604–05, 107 L.Ed.2d 603 (1990) (Scalia, J., concurring) (omission and second alteration in original). Thus, the district court was overly generous in applying mid-level scrutiny to the ordinance.

¶ 32 Under the four-part *O'Brien* content-neutral test used for analyzing symbolic speech, government regulation is sufficiently justified if (1) it is within the constitutional power of the government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *See O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679.

¶ 33 The Midvale ordinance clearly passes constitutional muster because it is unrelated to expression and Dr. John's has failed to demonstrate any communication that it might actually suppress. Dr. John's residual claim that the ordinance is unconstitutionally vague because it fails to denote exactly what constitutes items of a "sexual nature" also fails. It is clear that the sexual novelties sold by Dr. John's represent items of a "sexual nature." *See IDK, Inc. v. County of Clark*, 599 F.Supp. 1402, 1410–11 (D.Nev.1984) (holding any ambiguity in language classifying SOB and subsequent licensing requirements was not unconstitutionally vague where plaintiff's business was clearly an SOB).

¶ 34 That a city official may exercise discretion when classifying a business as an SOB is of no constitutional significance. Absent some type of different treatment, negative effect, or more onerous review process, city officials may classify a particular business any way they see fit. *See FW/PBS, Inc.*, 493 U.S. at 217, 110 S.Ct. at 604–05.

### B. Prior Restraint

#### 1. Inapplicability of Prior Restraint

¶ 35 The district court was correct in ruling that the determinative issue was licensing rather than censorship, and that the doctrine of prior restraint was simply inapplicable. A ministerial action as to licensing is not presumptively invalid, and unlike most prior restraints, the city is not required to justify its decision in court on every occasion. *See FW/PBS, Inc.*, 493 U.S. at 229, 110 S.Ct. at 606–07. This distinction is important because the constitutionality of the statute turns on whether the licensing scheme functions as a content-neutral time, place, and manner restriction or a censoring wolf in sheep's clothing that would trigger *Freedman's* rigid analysis.

¶ 36 Prior restraint is only at issue where the government exercises some form of cen-

Amendment scrutiny, but because, as a general law regulating conduct and not specifically directed at expression, it [was] not subject to First Amendment scrutiny at all.' " *City of Erie v. Pap's A.M.*, 529 U.S. 277, 285, 120 S.Ct. 1382, 1388–89, 146 L.Ed.2d 265 (2000) (Scalia, J., concurring) (quoting *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 572, 111 S.Ct. 2456, 2463, 115 L.Ed.2d 504 (1991) (Scalia, J., concurring)).

sorship or indirectly represses the communication of ideas before their dissemination. Generally, ordinances that have failed under prior restraint have either delegated unbridled discretion to state officials or lacked sufficient time restraints for the licensing process. *See FW/PBS, Inc.*, 493 U.S. at 225–26, 110 S.Ct. at 604–05.

■ ¶ 37 Prior restraint, notwithstanding Dr. John's nearly talismanic reliance on the mere assertion of the phrase, is not implicated by the ministerial requirement of a completed application. The mere invocation of the words "prior restraint" should not transmogrify a personal battle for laxer sexual mores into a constitutional issue, lest this court be led toward ruling on an issue of fundamental importance when Dr. John's harm is illusory and the restraint self-imposed. The record indicates that had Mr. Haltom truthfully filled out the proper form he would have been granted a license. As a practical matter, it is only Mr. Haltom's refusal to permit classification as an SOB that has allowed him to manufacture a fight with the government. Classification is clearly permissible without implicating any constitutional concerns. "The mere fact that ... material protected by the First Amendment is subject to ... licensing requirements is not a sufficient reason for invalidating [an] ordinanc[e]." *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 62, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976).

■ ¶ 38 The narrow question presented in this case is whether a municipality may require an SOB to complete a different application than a nonsexually oriented business. This question presents no intellectual challenge. The First Amendment has nothing to do with a wholly ministerial requirement that a business apply for and obtain a valid business license, even if that license is somehow different from other commercial establishments. There is no fundamental right to be free from government classification of a business as a certain type, nor a ministerial licensing provision, so long as the process does not restrict or otherwise negatively impact business owners. *See Young*, 427 U.S. at 70–71, 96 S.Ct. at 2452 ("[W]e hold that the State may legitimately use the content of

[sexually explicit] materials as the basis for placing them in a different classification...."); *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 812, 108 S.Ct. 2667, 2686, 101 L.Ed.2d 669 (1988) (Rehnquist, J., dissenting) (stating that "the statute differentiates between professional fundraisers and volunteer[s] ... [but] this fact alone does not impose an impermissible burden on protected speech, nor does it require that the licensing provisions be subjected to strict scrutiny").

¶ 39 Because municipalities may generally impose licensing requirements for purposes of regulation and zoning, and because the constitutionality of applying a more stringent application process for SOBs has been thoroughly examined by other courts, we forego a rigorous constitutional analysis and uphold the district court's decision. *See Schultz v. City of Cumberland*, 26 F.Supp.2d 1128, 1149 (W.D.Wis.1998) (holding licensing requirement mandating disclosure of prior criminal convictions not unconstitutional prior restraint); *IDK, Inc. v. County of Clark*, 599 F.Supp. 1402, 1410–11 (D.Nev.1984) (holding any ambiguity in language classifying SOB and subsequent licensing requirements not unconstitutionally vague where as applied to plaintiff it was clear that business was SOB); *St. Louis County v. B.A.P., Inc.*, 18 S.W.3d 397, 408–17 (Mo.Ct.App.2000) (holding licensing ordinances governing SOBs sufficiently narrowly tailored to satisfy constitutional concerns). *See generally* Lee R. Russ, Annotation, *Validity of Statutes or Ordinances Requiring Sex–Oriented Businesses to Obtain Operating Licenses*, 8 A.L.R.4th 130 (1981) (listing recent cases where ordinances have been found to be both constitutional and unconstitutional as prior restraints).

### 2. Prior Restraint Analysis

¶ 40 The district court correctly determined that the Midvale licensing scheme does not constitute a prior restraint on speech. A court may not properly engage in a prior restraint analysis prior to determining the level of protection afforded the subject matter and the manner in which the ordinance restricts expression. To do so places the cart before the horse. The propri-

ety of the analysis does not change because the regulation is facially attacked as unconstitutional. It is still necessary for the petitioner to demonstrate how the regulation affects expression, even if the restraint is hypothetical. In this case, even if the material were found to warrant protection under prior restraint analysis, the ordinance is constitutionally sound.

¶ 41 Prior restraint exists when speech or an analogue is conditioned upon the prior approval of public officials. Prior restraints are presumptively invalid because they typically involve "two evils that will not be tolerated": (1) the risk of censorship associated with the vesting of unbridled discretion in government officials; and (2) "the risk of indefinitely suppressing permissible speech" when a licensing law fails to provide for the prompt issuance of a license. *FW/ PBS, Inc. v. City of Dallas,* 493 U.S. 215, 227, 110 S.Ct. 596, 605, 107 L.Ed.2d 603 (1990). As the district court correctly held, the Midvale ordinance contains sufficient safeguards to redeem it from a facial assault.

¶ 42 In *FW/PBS, Inc.,* the Supreme Court applied *Freedman v. Maryland,* 380 U.S. 51, 58–59, 85 S.Ct. 734, 738–39, 13 L.Ed.2d 649 (1965), to a film censorship regulation. *See FW/PBS, Inc.,* 493 U.S. at 225–27, 110 S.Ct. at 604–05. *Freedman* provides a paradigmatic tripartite framework for analysis that is used in all prior restraint claims where the effect of the licensing provision is to restrict communication. *See, e.g., Riley v. Nat'l Fed'n of Blind of N.C., Inc.,* 487 U.S. 781, 802, 108 S.Ct. 2667, 2680–81, 101 L.Ed.2d 669 (1988); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558–64, 95 S.Ct. 1239, 1246–49, 43 L.Ed.2d 448 (1975); *United States v. Thirty–Seven Photographs,* 402 U.S. 363, 367–75, 91 S.Ct. 1400, 1403, 28 L.Ed.2d 822 (1971).

¶ 43 Although the fractured opinion in *FW/ PBS, Inc.* has been the subject of some controversy, the framework it provides for analyzing licensing regulations is controlling where the regulation has at least some potential to restrict expression. However, as the Supreme Court has made clear through decisions following *FW/PBS, Inc.,* mere business licensing does not trigger *Freedman* or *FW/*

*PBS, Inc.* analysis absent some discernible restriction on expression. *See Riley,* 487 U.S. at 795–96, 108 S.Ct. at 2676–77; *Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 62– 63, 96 S.Ct. 2440, 2448–49, 49 L.Ed.2d 310 (1976); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 54, 106 S.Ct. 925, 932, 89 L.Ed.2d 29 (1986). Nevertheless, the instant case provides an appropriate forum in which to comment on the analysis and may provide municipalities with some guidance in this complex area of constitutional law.

¶ 44 *FW/PBS, Inc.* involves the following tripartite framework. First, the licensing decision must be made within a brief and determinate period; second, the process must assure a prompt judicial decision in case of denial; and third, the scheme must place the burden of litigating a denial on the government. *See FW/PBS, Inc.,* 493 U.S. at 227, 110 S.Ct. at 606. Importantly, the plurality concluded that the third *Freedman* requirement, proving the unprotected nature of the speech, is inapplicable when a system of prior restraint does not require a public official to pass judgment on the content of any speech. *See* 493 U.S. at 229–30, 110 S.Ct. at 606–07.

¶ 45 The current problem does not involve the third requirement because it is only applicable where a form of censorship obtains and not where the content of the speech is merely incidental to the categorization of a business. That is, the third requirement applies where an official is making a yes or no licensing decision based on the content of the speech. *See id.* Here, the decision to categorize only results in the need for a different license and review process, rather than the ultimate decision regarding approval. Though there has been some disagreement in using an abbreviated *Freedman* test for content-neutral ordinances, it has never been suggested that a mere licensing regulation should be subject to the level of scrutiny Dr. John's suggests.

¶ 46 Thus, even if a prior restraint analysis were appropriate here, the Midvale ordinance is clearly constitutional. First, the ordinance is devoid of any unbridled official discretion that might render the ordinance

constitutionally infirm. Second, there are no temporal ambiguities that might result in unreasonably delaying licensing. Lastly, though the ordinance does not guarantee a prompt judicial determination as required by *FW/PBS, Inc.,* until the United States Supreme Court clarifies this problematic concept, a combination of provisional licensing and prompt judicial access will have to suffice. *See City News & Novelty, Inc. v. City of Waukesha,* 531 U.S. 278, 281, 121 S.Ct. 743, 746, 148 L.Ed.2d 757 (2001) (noting that "[c]ourts have divided over the meaning of *FW/PBS's* 'prompt judicial review' requirement," granting certiorari to resolve the conflict, and subsequently finding issue not "genuinely presented" resulting in dismissal). Absent an action by the city to restrict business operation while the issue is litigated, the "decision" language is not dispositive because the city granted a de facto provisional license.

### a. Unbridled Official Discretion

¶ 47 Dr. John's suggests that unbridled official discretion exists in the Midvale ordinance. A prior restraint involving official discretion exists when speech is conditioned upon the prior approval of public officials. *See, e.g., Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 556, 95 S.Ct. 1239, 1245–46, 43 L.Ed.2d 448 (1975) (finding prior restraint where approval of musical was conditioned on municipal board's decision). Although officials may exercise discretion in deciding that products are sexually oriented, this is not the type of discretion prohibited by *FW/PBS, Inc. See Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 61, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976) (finding vagueness relating to decision regarding threshold "sexually explicit activity" acceptable where ordinance described threshold as "characterized by an emphasis" on such matter).

¶ 48 Dr. John's fails to allege any harm deriving from the classification itself. Moreover, the explicit and mandatory language of the ordinance and lack of individual discretion in the licensing process effectively negate any concern that an official may delay or short-circuit the procedure. *See, e.g., City of Lakewood v. Plain Dealer Publ'g Co.,* 486

U.S. 750, 755–56, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988) (holding ordinance vesting discretion in official unconstitutional). Accordingly, the Midvale ordinance does not exhibit unbridled discretion.

### b. Fixed and Reasonable Time Restraints

¶ 49 The Midvale licensing scheme prescribes fixed and reasonable time periods for application review and does not contain language that might cause undue delay. The licensor must make the decision whether to issue the license within a specified time period and the appeals process subsequent to a denial is clear and unambiguous. The time periods for initial decision and appeal are mandatory and, at forty-five to sixty days, are well within limits that have been deemed acceptable by other courts. *See City of Colorado Springs v. Baby Dolls,* 896 P.2d 272, 282 (Colo.1995) (upholding forty-day limit); *Nightclubs, Inc. v. City of Paducah,* 202 F.3d 884, 892 (6th Cir.2000) (noting that under Supreme Court case law, processes including judicial review with " 'potential delays of over five months are impermissible' " (citations omitted)).

¶ 50 Moreover, the ordinance requires timely review, specified appeals processes, and mandatory approvals in cases where the city fails to act. *See, e.g.,* Midvale City, Utah, Midvale City Code § 5.56.130(E) (1998) (if agency fails to approve within 15–day extension, premises shall be deemed approved). These provisions are of the type and kind specifically found to be reasonable under *FW/PBS, Inc.* and *Freedman. See generally* Lee R. Russ, Annotation, *Validity of Statutes or Ordinances Requiring Sex-Oriented Businesses to Obtain Operating Licenses,* 8 A.L.R.4th 130 (1981) (listing cases where ordinances have been found to be both constitutional and unconstitutional as prior restraints).

¶ 51 Chief Justice Durham argues that the relatively innocuous phrase "good cause" injects the possibility of indeterminacy into the licensing process. This is a mistake. First, the record contains no suggestion that the phrase has ever been invoked. Second, the phrase is omnipresent in the legal field, and is very likely surplusage as used here.

Third, we can find no authority to support the concept that this phrase has ever been found to supply a level of indeterminacy necessary to void legislation. Finally, as we discuss below, even if we were to find this phrase problematic, the proper course of action would be to sever the offending words from the ordinance and leave intact the municipality's intent.

¶ 52 Even if we were to determine that the likely unintentional inclusion of the phrase "good cause" in the ordinance renders it constitutionally suspect, we must determine if that phrase is severable. The fact that the phrase has failed to attract judicial consideration in any similar context notwithstanding, the words are surplusage and clearly severable without affecting the legitimate purpose of the statute.

¶ 53 When reviewing the construction of statutes, "the general rule is 'that statutes, where possible, are to be construed so as to sustain their constitutionality. Accordingly, if a portion of the statute might be saved by severing the part that is unconstitutional, such should be done.' " *State v. Lopes,* 1999 UT 24, ¶ 18, 980 P.2d 191 (quoting *Celebrity Club, Inc. v. Utah Liquor Control Comm'n,* 657 P.2d 1293, 1299 (Utah 1982)).

¶ 54 In determining whether an unconstitutional portion is severable, "we look to legislative intent." *Lopes,* 1999 UT 24 at ¶ 19, 980 P.2d 191. When the legislature's intent is not expressly stated, we "turn to the statute itself, and examine the remaining constitutional portion of the statute in relation to the stricken portion. If the remainder of the statute is operable and still furthers the intended legislative purpose, the statute will be allowed to stand." *Id.; see also Berry v. Beech Aircraft Corp.,* 717 P.2d 670, 686 (Utah 1985) (" 'Severability, where part of an act is unconstitutional, is primarily a matter of legislative intent[,]' which generally is determined by whether the remaining portions of the act can stand alone and serve a legitimate purpose." (Citations omitted)). "The test fundamentally is whether the legislature would have passed the statute without the objectionable [i.e., the unconstitutional] part...." *Union Trust Co. v. Simmons,* 116 Utah 422, 429, 211 P.2d 190, 193 (1949); *see also Berry,* 717 P.2d at 686.

¶ 55 Although the ordinance does not include any indication of legislative intent regarding severability, it is indisputable that the ordinance is not only operable without the phrase, but completely unchanged. The phrase "good cause" is present in countless statutes, court rules, and contracts for no greater reason than word smiths believe it sounds lawyerly. In the present ordinance, the phrase serves no express or clear purpose, and is severable without any effect on the legitimate purpose of the ordinance. Thus, we must not smite the entire ordinance, leaving it neither root nor branch. Rather, pruning the vine would offer a more circumspect solution.

### c. Prompt Judicial Review

¶ 56 Most problematic is *FW/PBS, Inc.'s* requirement that the licensing process provide for not just prompt judicial access, but rather prompt judicial determination. The obvious dilemma created by the United States Supreme Court has been the subject of vociferous debates among the federal circuits and resulted in a split of authority as to what the Court "actually meant." *See* J. David Guerrera, *The Meaning Of Prompt Judicial Review Under The Prior Restraint Doctrine After FW/PBS, Inc. v. City of Dallas,* 62 Brook. L.Rev. 1217 (1996) (explaining split among circuits).

¶ 57 Since municipalities clearly lack any control over the judiciary and the timeliness of a decision, the "prompt judicial review" requirement is a veritable Pandora's box because it contains the most dangerous potential for indefinite and thus unconstitutional delays. At least one circuit has noted that a provisional license or equivalent measure exorcises the demons of delay, and we agree. *See Nightclubs, Inc. v. City of Paducah,* 202 F.3d 884, 894 (6th Cir.2000). *But see Déjà Vu of Nashville v. Metro. Gov't of Nashville,* 274 F.3d 377, 403 n. 8 (6th Cir.2001) (reaching the opposite conclusion under a different panel of the Sixth Circuit).

¶ 58 Although it is indisputable that *FW/ PBS, Inc.* mandates prompt judicial determi-

nation and not mere access, the remarkable split of authority among circuits, combined with the Supreme Court's refusal to rectify the acknowledged confusion in *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 285–86, 121 S.Ct. 743, 748, 148 L.Ed.2d 757 (2001), persuades us to advance an interim solution such as that suggested by the Sixth Circuit in *Nightclubs, Inc.*, 202 F.3d at 894. Thus, any city procedure, however informal, that maintains existence of the status quo pending judicial review, will suffice until the United States Supreme Court devises some way out of this imbroglio.

### III.  INJUNCTIVE RELIEF

#### A.  *Appropriateness of Injunctive Relief*

¶ 59 The trial court correctly determined that injunctive relief is available to a municipality under certain circumstances. Dr. John's claim that injunctive relief is always an inappropriate tool with which to halt the sale of expressive materials is misplaced. Although injunctive relief should be a measure of last resort and require a clear showing of irreparable harm, a municipality may obtain an injunction against a business selling protected material when that business operates without a license or violates some valid regulatory provision. *Ogden City v. Eagle Books*, 586 P.2d 436 (Utah 1978). Otherwise, any business with a newspaper rack could thwart the most mundane regulations under the guise of the First Amendment.

¶ 60 As we noted in *Eagle Books*, a city may employ a range of legal measures, including injunctions, to achieve compliance. Even with an otherwise valid regulation, however, when the materials sold represent clearly protected speech, injunctions must be a method of last resort. Moreover, in cases where expression is time sensitive, municipalities must exercise extreme caution in seeking court intervention, and courts must require a clear showing of irreparable harm before granting an injunction, ·however temporary. Regardless of any statutorily imposed time constraints, judicial review of any prior restraint claim must be expedited and err on the side of permitting the communication. Where applicable, interlocutory review should be sought and granted expeditiously so as to ensure a prompt judicial determination.

¶ 61 The nature of prior restraint magnifies any shortcomings in an ordinance where the administrative appeals process contains uncertainty regarding the method, manner, and time limits placed on the review. A constitutionally sound licensing scheme must provide an applicant with a swift administrative decision and an administrative appeals process that ensures prompt review and results. The Midvale ordinance contains none of the shortcomings found in constitutionally infirm regulations that have been examined by other courts.

### IV.  TIME, PLACE, AND MANNER RESTRICTIONS

#### A.  *Is the Ordinance a Valid Time, Place, and Manner Restriction?*

¶ 62 Recent decisions by the United States Supreme Court indicate municipalities may regulate the placement and ownership of sexually oriented businesses through time, place, and manner restrictions. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 440–41, 122 S.Ct. 1728, 1737, 152 L.Ed.2d 670 (2002). Such restrictions are termed content-neutral since they lack any form of censorship. Some difficulty in this area has arisen, however, because the analytical framework between content-neutral and content-based regulations is not altogether clear. As Justice Brennan noted in *FW/PBS, Inc.*, where a regulation is aimed at a specific type of business, the distinction between censorship and licensing may be illusory. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 241, 110 S.Ct. 596, 613, 107 L.Ed.2d 603 (1990) (Brennan, J., concurring). Finally, even if a licensing scheme is determined to be a content-neutral time, place, and manner regulation, when such an ordinance fails to provide adequate procedural safeguards, it is nonetheless unconstitutional.

¶ 63 *FW/PBS, Inc.* declined to elaborate on this issue, and as a result, courts are left with little to guide them in this area. *See id.* at 223, 110 S.Ct. at 603. However, other jurisdictions have held that an otherwise constitu-

tional ordinance that seeks to regulate the placement and ownership of SOBs may properly be termed a content-neutral scheme. While the motives underlying a licensing scheme should be examined in regard to the stated goals of controlling secondary effects of SOBs, a municipality surely has a justifiable interest in obtaining information on the business owner and restricting licensing in this respect.

¶ 64 Content-neutral means the regulation "is not aimed at the content of the speech but rather at the secondary effects of [the SOB] on the surrounding community." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986) (emphasis omitted). A regulation meets content-neutral time, place, and manner requirements if it (1) is content neutral; (2) is designed to serve a substantial government interest; and (3) does not unreasonably limit alternative avenues of expression. *See id.* at 46–55, 106 S.Ct. at 928–33.

¶ 65 The clear weight of jurisprudence in this area indicates that most courts consider the subject matter in this case as commercial speech and the regulation as a time, place, and manner restriction, resulting in a significantly lower level of scrutiny. *See id.* at 50, 106 S.Ct. at 930; *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 68–69, 96 S.Ct. 2440, 2451–52, 49 L.Ed.2d 310 (1976); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 1391, 146 L.Ed.2d 265 (2000); *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 770–71, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976). Nevertheless, while licensing schemes pose less substantial risks to protected speech than censorship schemes, the fact that a licensing process differentiates between certain types of businesses militates in favor of a slightly higher level of scrutiny than would be afforded commercial speech. *See FW/PBS, Inc.*, 493 U.S. at 226–28, 110 S.Ct. at 605–06.

¶ 66 There is significant disagreement in this area, which is perhaps best exemplified by the fractured nature of the Supreme Court's opinion in *FW/PBS, Inc.*, where Justice White, joined by Chief Justice Rehnquist and Justice Scalia, noted that it was unwise to apply prior restraint doctrine to licensing schemes aimed at preventing secondary effects. This tension is apparent in prior restraint cases that have followed *FW/PBS, Inc.*, and likely reflects the fact that it is impossible to neatly separate a licensing scheme's good intentions from its practical effects. Even a perfectly constitutional licensing scheme with carefully drafted procedural safeguards may have an altogether unforeseeable, unconstitutional effect in certain instances, and it is folly to expect municipalities to surmount this intractable problem.

¶ 67 If any central premise can be gleaned from *FW/PBS, Inc.* and its progeny, it is that licensing schemes should be analyzed with an eye toward prior restraint doctrine simply because First Amendment jurisprudence is one tough nut. Furthermore, "[i]f courts were compelled to wait until the government discriminated on the basis of content, they would lack the power to review licensing schemes in advance of their application and to require procedural safeguards." *Graff v. City of Chicago*, 986 F.2d 1055, 1067 (7th Cir.1993) (en banc).

¶ 68 Under the most restrictive interpretation, the Midvale ordinance regulates not conduct, but rather ownership, and is therefore clearly a content-neutral time, place, and manner restriction unrelated to expression. *See Renton*, 475 U.S. at 48–49, 106 S.Ct. at 929. Because the city does not exercise discretion over any particular expressive speech, the regulation is a "ministerial action that is not presumptively invalid." *FW/PBS, Inc.*, 493 U.S. at 229, 110 S.Ct. at 607. Under the *Renton* test, the ordinance is constitutional if it is narrowly tailored to serve a substantial governmental interest and allows for alternative avenues of communication. *See Renton*, 475 U.S. at 50, 106 S.Ct. at 930. As it now stands, an SOB may locate anywhere as long as the owner completes the proper application.

¶ 69 Clearly "[a]ny effect on the overall expression is de minimus [sic]." *Pap's A.M.*, 529 U.S. at 294, 120 S.Ct. at 1393. "If States are to be able to regulate secondary effects, then such de minimus [sic] intrusions on expression cannot be sufficient to render the ordinance content based." *Id.* at 294, 120

S.Ct. at 1394. At best, Dr. John's sexually explicit products rise to the level of expression found in the nude dancing in *Pap's A.M.* and should be afforded no more than marginal protection, rather than the cherubim and a flaming sword Dr. John's proposes.

¶ 70 Having determined that the licensing scheme is a valid time, place, and manner restriction would generally not end the inquiry. If the city sought to regulate the time, place, and manner of expression, the court would need to measure the city's proposed interests in regulating conduct and the availability of other channels of communication. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983). However, although the ordinance classifies certain businesses differently, it does not treat them differently and thus need not be tested by the strict scrutiny applied when government action impinges upon expression. The policy, therefore, need only rationally further a legitimate state purpose, and classification of SOBs is surely such a purpose.

### B. Did Midvale Meet Its Burden?

¶ 71 Regulations that affect expressive conduct require that the municipality bear the burden of demonstrating that the restriction is necessary and no broader than necessary to achieve the stated purpose. Midvale's express purpose in adopting the ordinance was to regulate secondary effects of sexually oriented businesses.

¶ 72 Remarkably, although the restrictions require different licensing procedures, the ordinance is a restriction of the weakest sort. Viewing the ordinance as a mere licensing scheme, as the district court did, that implicates no perceptible restriction on expression, the burden the city must bear is minimal and is clearly met here.

### V. STATE CONSTITUTIONAL CLAIMS

¶ 73 Though Dr. John's correctly asserts that the state constitution can provide protections that differ from those available under the federal Constitution, the failure to define the nature of those protections is fatal to this claim. A litigant who would appeal to the protections afforded by Utah's constitution must adequately brief state constitutional law issues rather than "making federal constitutional arguments and then mentioning, as an afterthought, that the act in question 'also' violates state constitutional law, without further explanation." *State v. Davis*, 972 P.2d 388, 394 (Utah 1998) (Durham, J., dissenting).

¶ 74 This court has consistently declined to address state constitutional claims that have been inadequately briefed. *See State v. Norris*, 2001 UT 104, ¶ 28, 48 P.3d 872; *State v. Lafferty*, 749 P.2d 1239, 1247 (Utah 1988). "Nominally alluding to [state constitutional provisions] without any analysis before the trial court does not sufficiently raise the issue to permit consideration by this court on appeal." *State v. Johnson*, 771 P.2d 326, 328 (Utah Ct.App.1989), *rev'd on other grounds, State v. Johnson*, 805 P.2d 761 (Utah 1991). For the court to consider a state constitutional claim, a litigant must at least define the nature of that protection and provide some argument as to how legal precedent supports its position. *See State v. Bobo*, 803 P.2d 1268, 1272–73 (Utah Ct.App. 1990).

¶ 75 Without analysis, the court can make no informed decision regarding whether the state constitutional provision in question was intended to mirror its federal counterpart, or whether it was intended to expand the scope of First Amendment guarantees. Dr. John's offers no analysis whatsoever in support of the argument for interpreting the Utah Constitution more broadly than the First Amendment. The fact that the Utah Supreme Court has interpreted article I, section 14 (search and seizure protections akin to the federal Fourth Amendment) does not mean that another, unrelated provision of the constitution should be expanded.

### VI. COMMERCIAL SPEECH

¶ 76 Because we determine that Dr. John's has no standing to facially attack the Midvale ordinance, it is unnecessary to address Midvale's commercial speech argument. We would decline to address it in any event, however, because it has not been adequately briefed, and it thus is not squarely before us.

See *Valcarce v. Fitzgerald*, 961 P.2d 305, 313 (Utah 1998) ("It is well established that an appellate court will decline to consider an argument that a party has failed to adequately brief.").

## CONCLUSION

¶ 77 The trial court performed an admirable job of sorting through the facts and reaching the true issue: A business owner looking for a fight with government refused to complete an application that classified his business correctly.

¶ 78 We affirm the trial court's order. A contrary result would invite any business owner with a magazine rack and a grudge against government to invoke the beatified phrases "prior restraint" and First Amendment. The issue before the court is neither unique nor novel. Municipalities may require businesses to apply for and obtain business licenses prior to operating, and remain well within the boundaries of the constitution. While the First Amendment and the doctrine of prior restraint are deserving of aggressive protection, it is likely that the court will soon enough have a case appropriate for this purpose.

¶ 79 Associate Chief Justice DURRANT, Justice RUSSON, and Justice WILKINS concur in Judge JACKSON's opinion.

¶ 80 Justice HOWE did not participate herein; Court of Appeals Judge NORMAN H. JACKSON sat.

DURRANT, Associate Chief Justice, concurring:

¶ 81 I concur in Judge Jackson's lead opinion upholding the Midvale city ordinance governing licensure of sexually-oriented businesses. I write additionally regarding the issue of standing to express an alternative rationale for denying Dr. John's facial challenge, to address its "as applied" challenge, and to express my view that the "good cause" exception does not need to be severed or given a limiting instruction at this time.

## I. STANDING—FACIAL CHALLENGE

¶ 82 Dr. John's facially challenges Midvale's ordinance governing licensure of sexually-oriented businesses as being unconstitutionally vague and overbroad. While I concur that Dr. John's lacks standing to mount a facial challenge, I base my decision on a different analysis than Judge Jackson. Judge Jackson concludes that Dr. John's lacks standing "to mount a facial attack on the Midvale ordinance because it has not shown that the ordinance has any deterrent effect on expression." However, Judge Jackson does not address the full scope of the ordinance in making his determination. Because Dr. John's challenges Midvale's ordinance facially, I believe we must look at the full scope of the ordinance when making this determination because different standing rules apply if a facial challenge involves First Amendment protections.

¶ 83 Midvale's ordinance requires adult bookstores, adult video stores, adult motion picture theaters, and other such businesses to obtain a sexually-oriented business license before operating. Midvale City, Utah, Code §§ 5.56.010, 5.56.040 (1998). Because some books, magazines, periodicals, films, and videos "depict[ing] or describ[ing] sexual activities or specified anatomical areas," *id.* § 5.56.010(A)(2), have been afforded some First Amendment protection, I believe Dr. John's facial challenge encompasses First Amendment rights.

¶ 84 When facial challenges are made on First Amendment grounds, normal standing requirements do not strictly apply. *Z.J. Gifts D–4, L.L.C. v. City of Littleton*, 311 F.3d 1220, 1226 (10th Cir.2002). Nevertheless, to have standing in this context a party must still " 'demonstrate its own cognizable injury in fact.' " *Id.* at 1227 (quoting *Nat'l Council for Improved Health v. Shalala*, 122 F.3d 878, 883 (10th Cir.1997)). "[T]his requirement is satisfied where the [party] is engaged 'in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution.' " *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). While Midvale's ordi-

nance may encompass protected speech, I do not believe that Dr. John's itself "is engaged 'in a course of conduct arguably affected with a constitutional interest.' " For this reason, I concur that Dr. John's lacks standing to mount a facial challenge to Midvale's ordinance.

¶ 85 According to the trial court's findings of fact, Dr. John's sells hundreds of sexual devices,[1] along with some candles, lotions, and lingerie. Additionally, it also sells a few sexually-explicit videos, books, and playing cards, but the number of these items are minimal in comparison to the other products sold by Dr. John's. Since the sale or rental of sexual devices yields no First Amendment protections, *FW/PBS v. City of Dallas*, 493 U.S. 215, 253–54 & n. 5, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (Scalia, J., concurring in part and dissenting in part), for the "simple reason" that such products "express[ ] nothing," *Yorko v. State*, 690 S.W.2d 260, 271 (Tex.Crim.App.1985) (Teague, J., dissenting) (citations omitted), Dr. John's is not "engaged 'in a course of conduct arguably affected with a constitutional interest.' "

¶ 86 The mere inclusion by Dr. John's of some videos or books in its store's inventory does not alter this analysis because the minimal number of such items in its inventory in comparison to the constitutionally unprotected products sold by Dr. John's is insufficient to vest it with a constitutional interest. To conclude otherwise would mean that any business could mount a facial challenge to such licensing ordinances if it simply included a magazine rack with a few pornographic magazines on its premises. This would be contrary to standing requirements, especially since such a party could not "reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (citation omitted). Hence, Dr. John's lacks the requisite injury in fact to mount a facial challenge.

## II. "AS APPLIED" CHALLENGE

¶ 87 Although the court concludes that Dr. John's lacks standing to mount a facial challenge, I believe it is still necessary to address Dr. John's challenge of Midvale's ordinance as it has been applied to him. Since Judge Jackson does not expressly address this issue, I turn now to a discussion of Dr. John's "as applied" challenge. Dr. John's has been "permanently enjoined from operating a sexually oriented business within the boundaries of Midvale City, and from selling sexually oriented products ... without first receiving a sexually oriented business license pursuant to Midvale City Code." It argues that the injunction is improper because Midvale's ordinance is unconstitutionally vague and overbroad as applied to it. I disagree.

### A. Vagueness Challenge

¶ 88 Under Midvale's ordinance, a business must obtain a sexually-oriented business license if the *principal purpose* of the business is to "offer[ ] for sale or rental ... instruments, devices or paraphernalia which are designated for use in connection with specified sexual activities, except for legitimate medically recognized contraceptives." Midvale City, Utah, Code §§ 5.56.010(A)(2), 5.56.040 (1998). Dr. John's contends that the phrase "principal purpose" is unconstitutionally vague as applied to it.

¶ 89 On June 28, 2000, Midvale denied Dr. John's application for a general business license based on its conclusion that Dr. John's must apply for a sexually-oriented business license because it carried some sexually-oriented items. While it is unclear whether Dr. John's initially operated a sexually-oriented business when it first applied for a general business license, later actions by Dr. John's demonstrate that its principal purpose was to operate a sexually-oriented business. The trial court made several findings of fact that support this conclusion. First, following Midvale's initial inspection, Dr.

---

1. Midvale's ordinance requires businesses to obtain a sexually-oriented business license if the principal purpose of a business is to "offer[ ] for sale or rental ... instruments, devices or paraphernalia which are designated for use in connection with specified sexual activities, except for legitimate medically recognized contraceptives." Midvale City, Utah, Code §§ 5.56.010(A)(2), 5.56.040 (1998).

John's added over 500 sexually-oriented devices and paraphernalia to its inventory. Second, it advertised its products in a sexually-oriented magazine and its advertisement depicted "a partially clad female in a provocative pose." Finally, Dr. John's anticipated making an eighty-percent profit on its sexually-oriented merchandise. Based on these findings, Dr. John's unquestionably was operating a sexually-oriented business and the phrase "principal purpose" was not unconstitutionally vague as applied to it.

### B.  Overbreadth Challenge

¶ 90 Dr. John's also contends that Midvale's ordinance is overbroad as applied to it because it vests too much discretion in city officials with respect to its business license application. Specifically, it argues that the fact that city officials determined it had to apply for a sexually-oriented business license rather than a general business license demonstrates unbridled discretion.

¶ 91 Typically, overbreadth challenges are made on the grounds that an ordinance "vests too much discretion in licensing officials in granting or denying a license," *Z.J. Gifts D–4*, 311 F.3d at 1227, or it vests too much discretion in licensing officials because it fails "to place brief, specific time limits on the decision-making process," *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 889 (6th Cir.2000) (citations omitted). While Dr. John's brief is not a model of clarity on this point, its overbreadth challenge does not appear to encompass either of these grounds. Instead it contends that the ordinance vests too much discretion in licensing officials because it authorizes Midvale officials to determine the type of license for which a business must apply. According to Dr. John's, this confers unbridled discretion on decision-makers. I am unaware of any cases that support Dr. John's contention. Moreover, the United States Supreme Court has implicitly recognized a city's authority to require sexually-oriented businesses to obtain a different type of license than other businesses. *See FW/PBS*, 493 U.S. at 223, 110 S.Ct. 596 (implicit-ly recognizing that city officials may require sexually-oriented businesses to obtain a different type of license from other businesses by not ruling that such licensing schemes are a per se violation of the Constitution). Finally, it is beyond question that Dr. John's was operating a sexually-oriented business. Hence, Dr. John's "as applied" challenge fails because Midvale's licensing officials did not have unbridled discretion when they determined the type of license for which Dr. John's must apply.

### III.  "GOOD CAUSE" EXCEPTION

¶ 92 Under Midvale City Code section 5.56.360, if a person appeals a denial or a qualified approval of a license, the hearing board must hear the appeal "within twenty days from the date of the appeal *unless such time shall be extended for good cause*." Midvale City, Utah, Code § 5.56.360(B) (1998) (emphasis added). Although the code sets forth a specific time frame in which an appeal must be heard, the "good cause" exception contains no corresponding time limit.

¶ 93 Having concluded that Dr. John's lacks standing to make a facial challenge to Midvale's ordinance, however, we need not address this issue.[2] Whether the "good cause" exception creates the possibility of an indeterminate delay such that it should be severed or given a limiting construction is a matter better left for another day. Because Judge Jackson's opinion may be somewhat ambiguous on this point, I expressly note my view that the "good cause" exception does not need to be severed or given a limiting construction at this time.

¶ 94 Justice RUSSON and Justice WILKINS concur in Associate Chief Justice DURRANT's opinion.

DURHAM, Chief Justice, dissenting:

¶ 95 I respectfully dissent.

¶ 96 While the trial court "[gave] the defendants the benefit of the doubt" and proceeded on the assumption that all the products sold by Dr. John's should be afforded

---

**2.**  Because Dr. John's did not file an administrative appeal, and the "good cause" exception only applies to the administrative appeal process, Dr. John's also lacks standing to challenge this provision as applied to it. *See Z.J. Gifts D–4*, 311 F.3d at 1228.

some level of First Amendment protection, the lead opinion has accepted Midvale's contention that the sale of sexual novelties is "unprotected commercial speech which falls beyond the ambit of First Amendment protection." I disagree.

¶ 97 In *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 770–71, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the United States Supreme Court held that commercial speech enjoys First Amendment protection, albeit to a lesser extent than some other speech. Midvale's assertion that Dr. John's has "no expressive intent ... beyond simply making a sale" misses the point, since for more than twenty-five years the Court has consistently held that "speech which does 'no more than propose a commercial transaction' " is protected by the First Amendment. *Id.* at 762, 96 S.Ct. 1817 (quoting *Pittsburgh Press Co. v. Human Relations Comm'n,* 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973)). That a seller's interest in communicating regarding his wares is predominantly economic "hardly disqualifies him from protection under the First Amendment." *Id.* The underlying assumption that the expressive intent of the seller is dispositive is also mistaken, since the Court in *Virginia Board of Pharmacy* considered not only the seller's interest in communicating, but also the interests of consumers and society generally, concluding that it is essential to the proper functioning of a free market economy that individual decisions regarding the allocation of resources be informed and intelligent. *Id.* at 765, 96 S.Ct. 1817.

¶ 98 The expressive nature of the products being sold is also irrelevant to a determination of whether the doctrines of commercial speech apply. Whether products or services are expressive in nature is significant in determining whether a restriction on the sale of those products or services must satisfy the requirements of the *O'Brien* test for content-neutral time, manner, and place restrictions affecting mingled expressive and non-expressive conduct, but it has no relevance to the doctrine of commercial speech. *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Indeed, the cases that have recently refined the commercial speech doctrine have largely arisen out of disputes regarding advertising for products with little or no claim to expressive content. *See, e.g., Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (regulation of tobacco advertising and sales practices); *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (ban on advertising the price of liquor); *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (ban on advertising by electrical utility companies); *Virginia Bd. of Pharmacy,* 425 U.S. 748, 96 S.Ct. 1817 (pharmacists advertising the prices of prescription drugs). So long as commercial speech concerns lawful activity and is not misleading, that speech falls within the ambit of First Amendment protection. *Lorillard Tobacco,* 533 U.S. at 554, 121 S.Ct. 2404; *44 Liquormart,* 517 U.S. at 500, 116 S.Ct. 1495; *Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343.[1]

¶ 99 The lead opinion's position on the nature of the underlying speech in this case allows it to avoid the special status accorded First Amendment rights in its analysis of standing. Facial challenges, while generally disfavored, are "permitted in the First Amendment context where [a] licensing

---

1. The lead opinion apparently takes the view that *selling* sexual novelties, unlike *advertising* the sale of sexual novelties, is not speech at all, but rather completely non-expressive conduct outside the ambit of the First Amendment protection. This argument was not clearly made either in Midvale's briefs or in oral argument. A recent United States Supreme Court decision, moreover, entertains a rather broad definition of commercial speech. In *Lorillard Tobacco* the United States Supreme Court applied the *Central Hudson* test for restrictions on commercial speech to a Massachusetts regulation requiring that tobac-co products be displayed in locations accessible only to sales personnel. Because the regulation in question was found to pass constitutional muster under *Central Hudson,* the Court did not need to determine whether or not there is a "cognizable speech interest in a particular means of displaying ... products," but in assuming, arguendo, that a First Amendment right might attach to product display, the Court has recently demonstrated an openness to expansive definitions of commercial speech. *Lorillard Tobacco,* 533 U.S. at 569, 121 S.Ct. 2404.

scheme vests unbridled discretion in the decisionmaker and where the regulation is challenged as overbroad." *FW/PBS v. City of Dallas*, 493 U.S. at 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). That an inability to operate is due to a failure to apply for a license rather than to the licensing process is irrelevant: "One who might have had a license for the asking may ... call into question the whole scheme of licensing." *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). A licensing scheme that allows the postponement of administrative and judicial decisions regarding the issuance or denial of a license makes a facial challenge particularly appropriate: "where a scheme creates a 'risk of delay,' such that 'every application of the statute create[s] an impermissible risk of suppression of ideas,' we have permitted parties to bring facial challenges." *FW/PBS*, 493 U.S. at 223–24, 110 S.Ct. 596 (quoting *Freedman v. Maryland*, 380 U.S. 51, 55, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 798 n. 15, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)).

¶ 100 It is evident to me from the foregoing that Dr. John's failure to apply for an appropriate business license does not affect his ability to challenge the ordinance. I also conclude that the prior restraint doctrine is applicable to licensing schemes for sexually-oriented businesses. I believe the lead opinion is mistaken in its conclusion that the ordinance is more properly analyzed as a content-neutral time, place, and manner restriction. While the holding of *FW/PBS* may be difficult to ascertain in some respects, it is clear that, Justice White's dissent notwithstanding, six justices agreed that such licensing schemes are to be analyzed as prior restraints.[2]

¶ 101 Dr. John's contends that the ordinance is unconstitutional on its face as a prior restraint, since it makes no mention of the availability of prompt judicial review in the event of an administrative decision denying a license. The lead opinion concludes that the prior restraint doctrine does not apply because it was Dr. John's failure to apply for a license, and not the licensing scheme, that resulted in the business's inability to operate, and because licensing schemes are properly analyzed as content-neutral time, place, and manner restrictions rather than as prior restraints.

¶ 102 It is well-settled that our legal system accords special protections to speech. First Amendment jurisprudence is honeycombed with tests designed to limit the state's power to impinge on the expression of political and religious ideas, and in recent years the United States Supreme Court has held that some level of First Amendment protection is also available for types of speech not generally viewed as vital to a vibrant public discourse, such as commercial speech and nude dancing. *See, e.g., 44 Liquormart, Inc.*, 517 U.S. at 496, 116 S.Ct. 1495 (stating that "the First Amendment protect[s] the dissemination of truthful and nonmisleading commercial speech about lawful products and services"); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (observing that nude dancing is expressive conduct, but falling only "within the outer ambit of the First Amendment's protection"). Government attempts to censor speech, even when part of efforts to isolate obscenity, which remains unprotected by the First Amendment, face a particularly heavy burden: "any system of prior restraints of expression comes to [the] Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). While prior restraints are not unconstitutional *per se, Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), establishes three strin-

---

**2.** While such a diversity of opinion inevitably leads to interpretive dilemmas, there is precedent to guide lower courts in deriving a holding from a fractured United States Supreme Court decision: "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five justices, the holding of the court may be viewed as the position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). That an opinion is fragmented is not a justification for treating any one opinion from the court as being as authoritative as any other. Even if no single rationale commands a majority, a position clearly in the minority cannot be taken as the holding of the Court.

gent safeguards that must be met in order for a prior restraint to pass constitutional muster. In order to be valid, a system of censorship must provide that

> (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court.

*FW/PBS*, 493 U.S. at 227, 110 S.Ct. 596 (restating *Freedman*, 380 U.S. at 58–59, 85 S.Ct. 734).

¶ 103 The Court has more recently adapted the *Freedman* rules to analyze schemes that, rather than prohibiting certain activities outright, create special licensing rules for businesses specializing in targeted classes of goods or services. In *FW/PBS*, the Court, reasoning that licensure schemes and systems of censorship pose related risks, used two of the three *Freedman* safeguards to analyze and strike down a Dallas licensing scheme for sexually-oriented businesses. "Like a censorship system, a licensing scheme creates the possibility that constitutionally protected speech will be suppressed where there are inadequate procedural safeguards to ensure prompt issuance of the license." *FW/PBS*, 493 U.S. at 226, 110 S.Ct. 596. While at least six justices on the *FW/PBS* court indicated that licensing schemes for sexually-oriented businesses should be analyzed under the prior restraint doctrine, the fractured nature of the opinion has created substantial difficulties in understanding the extent to which the *Freedman* factors apply. Justice Brennan, joined by two other justices, maintained that all three *Freedman* factors should apply with their original force to a licensing scheme. *Id.* at 239, 110 S.Ct. 596. Justice White, joined by one other justice, contended that the licensing scheme at issue would be more properly analyzed as a content-neutral time, manner, and place restriction than as a prior restraint. *Id.* at 244, 110 S.Ct. 596. Justice Scalia argued that the Dallas licensing scheme should not be subject to First Amendment scrutiny at all. *Id.* at

253, 110 S.Ct. 596. Justice O'Connor, joined by two other justices, wrote the opinion generally treated as crucial for determining the holding of the case. In Justice O'Connor's view, because a "licensing scheme ... does not present the grave 'dangers of a censorship system,' " only the first two *Freedman* safeguards are essential. *Id.* at 228, 110 S.Ct. 596 (quoting *Freedman*, 380 U.S. at 58, 85 S.Ct. 734). In Justice O'Connor's formulation, licensing schemes targeting sexually-oriented businesses may impose prior restraints only for a brief specified period and must also provide for prompt judicial review; the censor is required "to go to court and to bear the burden in court of justifying the denial." *Id.* While the federal circuits have split over the meaning assigned to "prompt judicial review," it is clear, at least, that a majority of justices on the Court agreed that licensure schemes targeting sexually-oriented businesses are properly analyzed under the prior restraint rubric.

¶ 104 Prior restraint doctrine is intended to prevent two constitutional evils: granting "unbridled discretion" to a government decision-maker, and failing to impose time limits within which a license or denial must be issued. *Id.* at 225–26. The *Freedman* procedural safeguards are intended to guard against these evils by requiring both a speedy conclusion to the administrative process for issuance or denial of licenses and the prompt availability of judicial review of the final administrative decision.

¶ 105 The Dallas ordinance regulating sexually-oriented businesses at issue in *FW/PBS* failed to make adequate provisions for either of the first two *Freedman* safeguards. The Dallas ordinance provided that a license would issue within thirty days provided an applicant met pertinent requirements, but also required that business premises pass several safety inspections prior to the issuance of the license. *FW/PBS*, 493 U.S. at 227, 110 S.Ct. 596. Since no time limits were provided within which those inspections were to be completed, the apparent certainty and brevity of the time line for administrative decisionmaking were undermined by the possibility that required inspections could come only after protracted delay, if at all. *Id.* The

possibility that protected speech will be suppressed for a potentially indefinite period is precisely what the doctrine of prior restraint is intended to prevent: "Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion. A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *Id.* at 227, 110 S.Ct. 596.

¶ 106 In amending the ordinance some nine months before the proceeding below, Midvale has been partially successful in curing the constitutional time limitation infirmities identified by the Court in *FW/PBS.* The ordinance now provides that the initial decision granting or denying a license must be made within forty-five days after receipt of an application. Midvale City, Utah, Code § 5.56.130(E). If an agency charged with reviewing the premises does not disapprove the premises within this period, the premises are deemed approved by that agency. *Id.*

¶ 107 While the particular defect from which the Dallas ordinance suffered in *FW/PBS* is avoided by this revision, the ordinance nonetheless falls short of the requirement that a licensing scheme "provide an effective limitation on the time within which the licensor's decision must be made." *FW/PBS,* 493 U.S. at 228, 110 S.Ct. 596. The revised ordinance does provide for a brief time frame within which the initial decision to grant or deny a license must be made, but it thereafter reintroduces the possibility of indeterminate delay in the administrative appeals process. License denials may be appealed to the business license administrator, who "shall schedule a hearing before the hearing board within twenty ... days from the date of the appeal *unless such time shall be extended for good cause.*" Midvale City, Utah, Code § 5.56.360(B) (emphasis added). Following the hearing the license administrator provides the city administrator with recommendations. "After the hearing, the license administrator shall have seven ... working days, *unless extended for good cause,* in which to render findings of fact, conclusions of law, and recommended decision to the City Administrator." *Id.* § 5.56.360(E) (emphasis added). These provisions create the possibility that an administrative appeal could be delayed by government applications for extensions "for good cause." Because the appeals portion of the ordinance does not define what constitutes good cause or provide for any limitation on how long an extension may be, I believe the possibility for abuse exists.[3] Building some flexibility into the time lines governing the administrative appeals process does not necessarily create a prior restraint, but provi-

---

**3.** The ordinance's failure to provide clear time limits on its administrative appeals process also complicates its ability to satisfy the second *Freedman* requirement, the availability of prompt judicial review. An ordinance's provision for uncertain administrative review may make the availability of prompt judicial review equally uncertain; an ordinance is "inadequate under any interpretation of 'prompt judicial review' [when] it creates the risk that expressive activity could be suppressed indefinitely prior to any judicial review of the decision to deny a license." *Redner v. Dean,* 29 F.3d 1495, 1502 (11th Cir.1994), *cert. denied,* 514 U.S. 1066, 115 S.Ct. 1697, 131 L.Ed.2d 560. Judicial review, prompt or not, is generally unavailable under Utah law until administrative remedies have been exhausted: "parties must exhaust applicable administrative remedies as a prerequisite to seeking judicial review." *Housing Auth. v. Snyder,* 2002 UT 28, ¶ 11, 44 P.3d 724 (citing *Nebeker v. Utah State Tax Comm'n,* 2001 UT 74, ¶ 14, 34 P.3d 180 (internal citations omitted)).

The Midvale ordinance makes no provision for judicial review, and accordingly has nothing to say as to whether exhaustion is necessary as a prerequisite to judicial review. These omissions lead to an ambiguity as to the prerequisites that must be fulfilled before judicial review is available that is unacceptable in the area of First Amendment rights. It is essential that "the freedoms of expression ... be ringed about with adequate bulwarks." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). The first *Freedman* factor is designed to provide an applicant with a swift administrative decision as to whether a license will be granted or denied, the second to ensure that prompt judicial review is available. A procedure that creates the possibility of indefinite delays in the administrative appeals process and then compounds that uncertainty by failing to provide a mechanism that will assuredly circumvent the faulty appeals process does not provide the guarantee of a speedy administrative determination required by United States Supreme Court precedent. The Midvale ordinance *guarantees* neither a swift resolution to the administrative process nor access to the courts as an alternative to a full administrative appeal.

sions so flexible that they could allow indefinite delays for unspecified reasons do. The ability to litigate the meaning of "good cause" or the length of a particular delay is no substitute for the brief and defined period for administrative decision-making that *FW/PBS* requires. If Midvale wishes to include some provision for permissible delays in the administrative appeals process, I believe it must provide guidance as to what constitutes good cause and include outside limits on delays so that the appeals process will be concluded within a brief, specified period. I believe the ordinance, as it now stands, fails to provide the first *Freedman* safeguard required by *FW/PBS,* and is therefore an unconstitutional prior restraint.

¶ 108 Justice RUSSON acted on this opinion prior to his retirement.